Vicky K. Horton, as administratrix of the estate of her husband, Max G. Kimbrell, deceased, appeals from a judgment entered in favor of Kimbrell's brothers, Walter Byron Kimbrell and Wiley Spurgeon Kimbrell. We reverse and remand.
This dispute arises out of the dissolution of a general partnership; the partners were Max G. Kimbrell, Walter Byron Kimbrell, and Wiley Spurgeon Kimbrell. The partnership, known as "Kimbrell Brothers Logging," was formed in 1988; there was no written partnership agreement. Max's role in the partnership consisted of operating a logging truck and a "skidder."
On August 11, 1995, Max informed Walter that he could no longer perform his partnership duties, because of other commitments. Thereafter, Max performed no further partnership duties. Following that conversation, the logging operations of Kimbrell Brothers Logging continued unabated under the direction of Walter and Wiley. Walter testified that on September 10, 1995, Max told Walter that he "would not be able to pay his [life and hospital] insurance premiums . . . for that particular month." Walter further testified: "I told him that I would pay it. I told him it had already been [taken] care of." The next day, September 11, 1995, Max was killed in an automobile accident.[1] On April 26, 1996, Horton received letters of administration for her husband's estate from the Fayette Probate Court.
In June 1997, Wiley left the partnership. In connection with the cessation of Wiley's participation in the business, Walter and Wiley agreed that Walter would pay the premiums of Wiley's health and life insurance policies for one year. Thereafter, the logging operations continued under Walter's direction as "Circle K Logging," until Walter ceased operations in 2000.
The administration of Max's estate was settled on September 24, 1997. Horton's final inventory included no claim to assets allegedly held by, or due from, the partnership. Approximately 17 months after the estate was closed, however, Horton filed a second petition in the Fayette Probate Court, pursuant to Ala. Code 1975, § 43-2-274, seeking letters of administration to reopen Max's estate. On February 4, 1999, that court granted Horton's petition.
On February 17, 1999, Horton filed a complaint in the Fayette Circuit Court against Walter and Wiley, seeking an accounting of the partnership. More specifically, she alleged that Max had died "seized and possessed of a one-third interest in the partnership," and that Max's death "dissolved the partnership . . . and entitled [her] to an accounting and settlement of [Max's] interest." She "demand[ed] that the partnership and the defendants account to [her] and settle the partnership . . . in the sum of the value of [Max's] interest at the time of the dissolution of the partnership." Following a nonjury trial, the trial court entered a judgment in favor of the defendants. The judgment stated in pertinent part:
 "There is no evidence that after August 11, 1995, Max was a partner in the business. There was no intent and agreement to be a partner, there was no sharing [of] the profits and losses, and there was no sharing of management and community of interest in the partnership. Furthermore, it is undisputed that he voluntarily left the *Page 603 
 business/partnership on August 11, 1995, a month before his death.
". . . .
 "Based on the foregoing, the court finds and holds that the partnership was dissolved August 11, 1995, when Max G. Kimbrell, Jr., ceased to be associated in the carrying on of the partnership and that he was not seized and possessed of a one-third interest of the partnership at the time of his death on September 11, 1995."
(Emphasis added.)
From that judgment, Horton appealed. She contends that the trial court misapplied partnership law, as expressed in the Alabama Partnership Act, Ala. Code 1975, §§ 10-8-1 to -103 ("the Act"),[2] Alabama's version of the Uniform Partnership Act. We agree.
The Act defines the dissolution of a partnership as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on, as distinguished from the winding up, of the business." § 10-8-90. "On dissolution, the partnership is not terminated, but continues until the winding up of partnership affairs is completed." § 10-8-93.
 "When any partner retires or dies, and the business is continued under any of the conditions set forth in subsections (a), (b), (c), (e) and (f) of Section 10-8-102[3] . . ., without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative, as against such persons or partnership, may have the value of his interest at the date of dissolution ascertained and shall receive as an ordinary creditor
an amount equal to the value of his interest in the dissolved partnership with interest or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership. . . ."
§ 10-8-103 (emphasis added). The "interest" of a partner "consists of rights against the other partners to share in profits, participate in management, and receive the benefit of their services." 1 Alan Bromberg 
Larry Ribstein, Bromberg Ribstein on Partnership § 3.06, at 3:129 (2001). See § 10-8-40 ("A partner's interest in the partnership is his share of the profits and surplus, and the same is personal property."). Otherwise stated, a partner's interest is "in the nature of achose in action." Bromberg Ribstein, supra, at 3:129 (emphasis added). See Perkins v. Oklahoma Tax Comm'n, 428 P.2d 328, 330 (Okla. 1967); Lynchv. Kentucky Tax Comm'n, 333 S.W.2d 257, 260 (Ky. 1960); see also 1 Scott Rowley, Rowley on Partnership § 26.1, at 569 (2d ed. 1960) ("a partner's interest is an intangible and a chose in action").
Upon death, chooses in action of which a decedent was seized at the time of his death pass to his personal representative, who is "charged with the duty of collecting and reducing them to possession." Arledge v.Ellison, 247 Ala. 190, 193, 23 So.2d 389, 391 (1945). In other words, a retiring partner's personal representative *Page 604 
succeeds to the right possessed by the retiring partner at the time of his death. See 59A Am. Jur.2d Partnership § 1140, at 797 (1987) ("The interest to which [the representative of a deceased partner] succeeds is a chose in action in the nature of a right to receive in cash the sum of money shown to be due him on a liquidation and accounting.").
We assume, for the sake of argument,[4] that Max's statement to Walter on August 11, 1995, that he could no longer perform his duties, effected a dissolution of the partnership. Nevertheless, when Max died one month later, he — as a retiring partner — owned a chose in action, namely, the right to "have the value of his interest at the date of dissolution ascertained and [to] receive . . . an amount equal to the value of his interest in the dissolved partnership with interest . . . or, . . . in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership. . . ." § 10-8-103. Upon his death, this right passed to Horton, his personal representative. The trial court erred, therefore, in concluding that Horton had acquired no right to demand an accounting of Max's interest in the partnership.
The Kimbrells, however, contend the evidence supports a finding that there was a "winding up" of the partnership, coupled with an implicit agreement to forgo an accounting. Specifically, they argue that the conversation between Max and Walter that occurred on September 10, 1995, the day before Max was killed, constituted an agreement that Max's leaving ipso facto wound up the partnership and that there would be no accounting. They concede that the trial court specifically made no such findings. However, they contend that the trial judge could have so found. For two reasons, we disagree.
First, the "dissolution" and the "winding up" of a partnership are separate concepts. "Winding up" is defined as the "[p]rocess of settling the accounts and liquidating the assets of a partnership or corporation, for the purpose of making distribution of net assets to shareholders or partners and dissolving the concern." Black's Law Dictionary 1601 (6th ed. 1990). At a minimum, the term "describe[s] an extended process of settling the interests of the partners in the dissolved firm even if the partnership is reconstituted." 2 Bromberg Ribstein on Partnership, supra, § 7.08(a), at 7:120. See In re Doddy, 164 B.R. 276, 278
(Bankr.S.D.Ohio 1994) (under the provision of Ohio's version of the Uniform Partnership Act that corresponds to Ala. Code 1975, § 10-8-99, "winding up of the partnership involves applying the partnership property to obligations of the partnership, first toward debts owing to outside creditors, and then toward amounts owing to partners for loans, capital contributions, and profits, in that order"). "Kimbrell Brothers Logging" continued after Max's departure and engaged in none of the operations ordinarily associated with winding up.
Second, the trial court could not have found that the conversation between Max and Walter on September 10, 1995, constituted an "agreement" to forgo an accounting. Walter described that conversation as follows:
 "Q. [By counsel for the Kimbrells] Did you have any conversations with Max immediately prior to his death?
"A. [By Walter Kimbrell] Yes, sir. *Page 605 
"Q. Would you tell the court about that, please, or those?
 "A. On Sunday — I was moderator of Fayette County Baptist Association and we had an associational meeting and he was one of the people in the meeting — and after the meeting, we were outside talking and he let me know that he wouldn't be able to pay his insurance premiums, you know, for that particular month. And I told him —
"Q. What sort of insurance?
"A. The life insurance and hospital insurance.
"Q. All right. Go ahead.
 "A. And I told him that I would pay it. I told him it had already been [taken] care of.
"Q. All right. When was that?
"A. That was on September 10.
"Q. The day before he died?
"A. The day before he was killed."
The September 10 conversation was merely a casual conversation, having no objectively discernible connection to the partnership. Neither party to the conversation mentioned the partnership, or an "accounting." There is no evidence that the parties considered Walter's statement to be more than a promise to pay Max's September insurance premiums, or that they considered the payment to a be an expenditure of the partnership. In other words, there is no evidence that they considered Walter's statement to be a promise — on the part of the partnership — to pay Max's insurance premiums, in exchange for a waiver of Max's statutory right to an accounting and a settlement of his partnership interest.
In a further attempt to establish the existence of an agreement on the part of the partnership to pay Max's insurance premiums, the Kimbrells rely on the payment of Wiley's insurance, upon his retirement from the partnership. More specifically, they assert that "it was agreed that [Wiley's] life and health insurance would continue to be paid by the business for a year." Thus, they argue, because Walter and Wiley agreedin 1997 to the payment of Wiley's insurance premiums for one year, Walter and Max must have agreed in 1995 to the payment of Max's premiums for a year and those payments would constitute a settlement of his partnership interest.
We disagree with this argument. First, the argument contradicts Walter's clear testimony as to the brief conversation he had with Max the day before Max died. Second, whatever agreement Walter and Wiley might have negotiated in 1997 has no bearing on what Walter and Max
contemplated in their conversation two years earlier. In short, the record would not have supported a finding — had the trial court made one — that Max agreed to waive his statutory rights to an accounting and settlement of his partnership interest in return for payment by the reconstituted partnership of his insurance premiums.
Next, the Kimbrells contend that Horton's action — which was facilitated by the reopening of the estate, pursuant to § 43-2-274
— is barred by this Court's construction of that statute. See Exparte Elliott, 477 So.2d 358 (Ala. 1985). We disagree with that contention.
Section 43-2-274 provides:
 "After a final settlement, there being personalty not administered which requires an administrator for the proper disposition thereof, the judge of probate of the proper county must proceed to appoint a suitable person as administrator who shall give bond as required by law and administer the personal estate *Page 606 
of the decedent not already administered."
Ex parte Elliott arose "out of the settlement of the estate of Nena Kyle Elliott," who died in 1945. 477 So.2d at 359. "[A] final settlement closing the administration of the estate was ordered" in 1949. 477 So.2d at 359. In 1984, John C. Elliott and other heirs sought the appointment of a "supplemental administrator to pursue undistributed assets of the estate that were allegedly fraudulently conveyed out of the estate." 477 So.2d at 359. More specifically, the heirs alleged that Elliott's son-in-law had, for approximately six years after Elliott's death, fraudulently conveyed real estate belonging to the estate. Relying on § 43-2-274, the heirs petitioned this Court for a writ of mandamus directing the special appointment for the purpose of reopening the estate. "They want[ed] an administrator appointed who would have standing and the inherent power to seek out and trace [the] assets in order to bring them back into the estate for distribution." 477 So.2d at 359.
This Court denied the petition. In doing so, it explained:
 "[Section 43-2-274] allows an administrator to be appointed, after a final settlement, to distribute personalty, which is the type of property involved in this petition. In addition, this provision appears to apply to personalty which is in the estate at the present time but which for some reason was not administered, perhaps due to an error by the administrator. That is not the situation in this case. Here the petitioners want to `create' property. They want an administrator to trace property that was conveyed approximately 40 years ago and attempt to bring it back into the estate."
477 So.2d at 359 (emphasis added).
This case is different. The personalty involved here is the statutory right to "have the value of [Max's] interest at the date of dissolution ascertained and [to] receive . . . an amount equal to the value of his interest in the dissolved partnership with interest . . . or, . . . in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership." § 10-8-103. As we have already explained in this opinion, Max possessed this right at the time of his death. The right then passed to his personal representative, Horton, who brought this action. Thus, the personalty involved here has always been
in the estate. For these reasons, Elliott is no bar to this action.
Finally, the Kimbrells contend that the action is barred by the doctrine of laches.[5] The applicability of the doctrine of laches is "dependent upon the particular facts and circumstances" of each case.Dear v. Peek, 261 Ala. 137, 141, 73 So.2d 358, 361 (1954). "Where the question of laches is presented, the facts and circumstances of each case govern the court in the exercise of the discretion thereby invoked for the determination of the inquiry." Jones v. Ball, 294 Ala. 654, 656,320 So.2d 665, 667 (1975) (internal quotations omitted). The applicability of the doctrine is "committed to the sound discretion of the trial court." Wallace v. Hardee's of Oxford, Inc., 874 F. Supp. 374, 377
(M.D.Ala. 1995). Thus, whether a trial court erred in applying the doctrine of laches is reviewed under an abuse-of-discretion standard.Bishop v. Pierce, 726 So.2d 663, 666 (Ala.Civ.App. 1998). Here, where there is no clear indication in the *Page 607 
record of how, or even whether, the trial court applied the laches doctrine, we decline to address the laches issue.
In summary, the trial court's judgment in favor of the Kimbrells resulted from a misapplication of provisions of the Act. For these reasons, the judgment is reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
Houston, See, Lyons, Brown, Johnstone, Harwood, and Stuart, JJ., concur.
Moore, C.J., dissents.
[1] Upon Max's death, Horton received life-insurance proceeds in the amount of $100,000, clearly evidencing payment of the policy.
[2] Although the Act has been superseded by Alabama's Uniform Partnership Act, Act No. 96-528, 1996 Ala. Acts, codified at Ala. Code 1975, §§ 10-8A-101 to — 1109, it is undisputed that the transactions in this case are governed by the provisions of the former partnership act.
[3] The subsections relevant here are § 10-8-102(a) and (c), which apply when a partner retires.
[4] Horton states that "[f]or purposes of determining the rights of the parties, it does not matter whether the partnership was dissolved by voluntary withdrawal or by death; the rights and duties of the partners are the same." Brief of Appellant, at 9.
[5] The Kimbrells have not asserted a statute-of-limitations defense. Therefore, this case presents no issue regarding the statute of limitations.