MURDOCK, Justice.
The L.B. Whitfield, III Family LLC (“the Family LLC”) appeals from a judgment entered by the Montgomery Circuit Court that ordered the Family LLC to wind up its affairs following its dissolution on the death of its sole member and to return 22 shares of Class A voting stock in Whitfield Foods, Inc. (“Whitfield Foods”), to Virginia Ann Whitfield, Almeida Fair Whitfield Strawder, and Valerie Lee Whitfield Puckett (“the sisters”). We affirm in part and reverse in part the judgment of the trial court.

I. Facts and Procedural History

L.B. Whitfield III (“L.B.”) was the father of the sisters and of L.B. Whitfield IV (“Louie”).[1] Whitfield Foods is a food-pro *175 cessing and packing company established in 1906 that has been owned by at least four generations of the Whitfield family. At the time this action was filed, Louie was vice president of administration for Whitfield Foods. He had worked for the company for 20 years and had served on its board of directors for 10 years.
According to a final order of the Montgomery Circuit Court issued in 2001 in an action against L.B.’s estate not directly related to the matter before us, L.B. owned 50% of the voting stock in Whitfield Foods; his brother, Frank Whitfield, owned the other 50% of the voting stock. Frank Whitfield died in the mid-1990s and left his stock in trust to his son. The 2001 order states that after his brother’s death, L.B.
“had concerns about the [dilution] of his voting stock if it passed to his children in equal shares. On the advice of the Board of Directors [of Whitfield Foods,] the L.B. Whitfield, III, Family L.L.C., was formed in 1998. The purpose of forming the company was to preserve the voting balance between his stock and his brother’s son’s stock.”
The parties agree that well before the formation of the Family LLC, the sisters had come into ownership of a combined 22 shares of Class A voting stock in Whitfield Foods (“the 22 voting shares”).[2] Virginia owned 14 shares, Valerie owned 4 shares, and Almeida owned 4 shares. Testimony in the trial of this action revealed that the sisters obtained 11 of those shares by virtue of their grandfather giving those 11 shares to their mother; when L.B. and their mother divorced, the settlement allotted the shares to the sisters: four to Valerie Puckett, four to Almeida Strawder, and three to Virginia Whitfield. Virginia Whitfield separately had received 11 shares from the grandfather.
On April 18, 1981, L.B. and the sisters entered into a stock purchase agreement (“the 1981 agreement”) in which the sisters agreed to give their father, L.B., the 22 voting shares in exchange for receiving twice as many shares — 44—of Class' B nonvoting stock in Whitfield Foods. The 1981 agreement provided that after L.B.’s death, “his heirs, successors and assigns shall not, without the written consent of the other, sell any of the twenty-two (22) shares of the Voting Stock without first offering such shares to the Sisters.” It further provided that after L.B.’s death, within 90 days of “the date ten (10) years after the distribution of the Voting Stock to the person, trust or other entity entitled to receive the Voting stock from [L.B.’s] estate,” the sisters would have the right to reacquire the 22 voting shares “by giving written notice of desire to reacquire the Voting Stock” and by tendering as consideration the shares of Class B nonvoting stock the sisters held.
On August 81, 1998, L.B. visited his daughters in Mississippi and presented them with a handwritten paragraph appended to the end of a copy of the 1981 agreement (“the 1998 cancellation agreement”) that provided as follows: “All of the undersigned agree that the foregoing stock purchase agreement dated April 18, 1981 is canceled and is void effective on this date and no party has any further rights or obligations herein.” The 1998 cancellation agreement bears the signatures of L.B. and each of the sisters.
On October 7, 1998, L.B. formed the Family LLC.[3] He transferred 1,283.5 *176 shares of Class A voting stock — including the 22 voting shares — and 870 shares of Class B nonvoting stock in Whitfield Foods into the Family LLC.
The articles of organization of the Family LLC provided that it was formed to, among other purposes, “purchase, acquire, own, hold, vote, and otherwise deal with stock of Whitfield Foods, Inc., and such other property to which such stock may at any time be converted or as may become an asset of the Company,” and “to maintain property separate from member’s other assets.” The articles of organization designated L.B. as the sole “initial member” of the Family LLC, and it named L.B. and Louie as the “managers” of the Family LLC. The articles of organization stated that “[t]he managers shall have the sole right to manage and conduct the business” of the Family LLC.
On the same date on which the Family LLC was formed, L.B. executed his will. The will made specific bequests of certain property and provided that the residue of L.B.’s real and personal property was to be divided in four equal shares to Louie and each of the sisters.
On August 18, 2000, L.B. died. Louie was appointed executor of L.B.’s estate in accordance with L.B.’s will. Louie thereafter took several steps in his roles as executor of L.B.’s estate and manager of the Family LLC that the Family LLC contends were part of an effort to continue the Family LLC in the wake of L.B.’s death. Those actions included: (1) obtaining an employer-identification number necessary for a multimember limited liability company; (2) opening a bank account for the dividends received on the shares of Whitfield Foods held by the Family LLC; and (3) working with accountants to establish capital accounts for himself and the sisters.
In 2003, a “Consent and Release” document was mailed to and signed by all shareholders of stock in Whitfield Foods, which approved a proposal that dividend payments would be made only in Class B nonvoting stock. The document identified the Family LLC as an owner of both Class A and Class B stock in Whitfield Foods. The sisters received and signed copies of this document.
On March 15, 2005, the sisters signed a consent to the settlement of L.B.’s estate, which provided, in part, that they acknowledged “receipt in full of the property devised to me under the Will of said decedent” and that they “accepted] service of notice of the filing of the petition for final settlement.” On April 13, 2005, Louie filed a petition for final settlement of L.B.’s estate, in which Louie listed the Family LLC as an asset “on hand” in the estate. On July 20, 2005, the Montgomery Circuit Court entered a “Decree on Final Settlement” of L.B.’s estate, in which it stated that “the accounting” of assets, receipts, and disbursements proffered in the petition “was accepted by the Court.”[4] In the *177 same order, the circuit court ruled upon a claim by L.B.’s wife at the time of his death regarding whether she was entitled to a portion of accumulated property in the estate. The order describes the dispute over this claim as “[t]he only substantive issue before the Court on Final Settlement.”
Following the closing of the estate-administration proceedings, Louie and the sisters each began receiving a 25 percent share of the dividends produced from the stock in Whitfield Foods that had been placed in the Family LCC. Those distribution checks were deposited in capital accounts that had been established for each individual. K-l federal tax forms were issued with respect to the receipt of those dividends.
On November 26, 2007, Virginia Whitfield sent an e-mail to the president of Whitfield Foods in which she stated that “the A [stock] is in the [Family] LLC.” In 2008, Valerie Puckett telephoned Louie and requested that the Family LLC loan her $2,000. The Family LLC wired her the money, and Puckett’s next distribution check from the Family LLC was adjusted down by $2,000 as repayment for the loan.
At one time, at least two of the sisters regularly attended meetings of Whitfield Foods’ board of directors. Subsequently, the board of directors — including Louie— voted to bar the sisters from attending regular board meetings and to prohibit them from working for Whitfield Foods. After this vote, the only meeting the sisters were permitted to attend was the annual meeting of the board.
On May 19, 2010, July 14, 2010, and October 5, 2010, the sisters wrote letters to Louie requesting that he return the 22 voting shares to the sisters. In those letters, the sisters expressly based their request upon the 1981 agreement between L.B. and the sisters. As contemplated by that agreement, the sisters stated that they would return the shares of Class B nonvoting stock they had received from their father in exchange for the 22 voting shares. The letters did not mention the 1998 cancellation agreement purporting to void the 1981 agreement. Louie denied those requests.
On November 30, 2010, a complaint was filed in the Montgomery Circuit Court in which the Family LLC was named as the plaintiff. The complaint sought a judgment declaring that the sisters had no right to reacquire the 22 voting shares then held by the Family LLC. On December 22, 2010, the sisters filed an answer, a counterclaim against the Family LLC, and a third-party complaint against Louie as manager of the Family LLC. The sisters subsequently dismissed their third-party complaint against Louie.
The counterclaim contained five counts. First, the sisters sought a declaration that “the Sisters are entitled to have their Non-Voting Stock exchanged for Voting Stock, pursuant to the terms of the [1981] Agreement.” Second, the sisters requested that the trial court enter a preliminary injunction to keep
“the Family LLC ... from depleting the assets of the Family LLC, from taking any actions other than that which is necessary and appropriate to wind up the affairs of the Family LLC and distribute its assets and requiring [it] to comply with the [1981] Agreement by tendering the Voting Stock to the Sisters according to the Agreement.”
Third, the sisters requested an accounting from the Family LLC. Fourth, the sisters claimed that the Family LLC had breached the 1981 agreement by “failing] and refusing] to tender or deliver the Sisters’ Voting Stock,” even though the sisters had “abided by all of the terms of the [1981] *178 Agreement and ha[d] tendered their NonVoting shares as required by the [1981] Agreement.” Finally, the sisters made a claim for conversion/wrongful detention because “[u]nder the terms of the [1981] Agreement, [the] Sisters are entitled to immediate possession of their shares of Voting Stock,” and the sisters “made a demand for the return of their shares of Voting Stock but the Family LLC ... ha[s] failed and refused to. tender or deliver the Sisters’ Voting Stock.” The complaint did not mention the 1998 cancellation agreement.
On January 21, 2011, the Family LLC filed an answer to the sisters’ counterclaim in which it raised, among other things, the defenses of res judicata, laches, estoppel, and waiver. On March 8, 2011, the Family LLC filed an amended answer in which it pleaded additional defenses to the sisters’ counterclaims.
On April 4, 2011, the sisters filed an amended counterclaim in which they withdrew the language of the second count in their original complaint and in its place substituted a request for a permanent injunction against the Family LLC “ordering the [Family LLC] to take only those actions which are necessary and appropriate to wind up the affairs of the Family LLC and to distribute the Family LLC’s assets and further require the Family LLC to comply with the [1981] Agreement by tendering the Voting Stock to the Sisters according to the [1981] Agreement.” The request was based on the allegation that the Family LLC was “dissolved as both a matter of law and according to the terms of the operating agreement upon [L.B.’s] death[; therefore,] the Family LLC may take only such actions as are necessary and appropriate under Code of Alabama § 10-12-39 [now codified at § 10A-5-7.03] to wind up the affairs of the Family LLC.”
Both sides filed motions for a summary judgment, which the trial court denied. On June 13, 2011, a two-day bench trial commenced in which the trial court heard testimony from several witnesses, including Louie and all the sisters. On August 26, 2011, the trial court entered its “Order and Judgment” on the matters before it. The trial court concluded that the Alabama Limited Liability Company Law, § 10A-5-1.01 et seq., Ala.Code 1975 (“the LLC Law”), dictated that the Family LLC
“was dissolved on August 18, 2000, and its existence was not thereafter extended by an agreement in writing of the owners of the financial rights. Alternatively, the Court finds that the [Family LLC] was dissolved on July 19, 2005,[5] and was not then extended by an agreement in writing among all the owners of the financial rights.
“The Court further finds that the affairs of the [Family LLC] must be promptly wound up and its assets distributed. The evidence shows that the only tasks necessary to accomplish the winding up are for the LLC, through its manager [Louie], to furnish an accounting of the monies received and the payments made since the date of dissolution on August 18, 2000.”
The trial court also concluded that “the 1981 Agreement was voided and cancelled on August 31, 1998.” As a consequence, the trial court ordered that the 22 voting shares “originally belonging to [the sisters]” be returned to them, so that Virginia would receive 14 shares, Valerie would receive 4 shares, and Almeida would re *179 ceive 4 shares. The trial court ordered the sisters to return to the Family LLC the 44 shares of Class B nonvoting stock they had received as part of the 1981 agreement, and it ordered that those shares were to be “distributed [to Louie and the sisters] in four equal shares.” The trial court stated that the Family LLC, “through its manager, shall then cause the transfer of all the other stock held by the LLC, and any cash on hand, to [the sisters] and [Louie], in equal shares.” The trial court provided a deadline for the accounting, and it ordered articles of dissolution to be filed with the Montgomery County Probate Court.
Subsequently, the Family LLC filed a motion for a new trial, which the trial court denied.' On December 20, 2011, the Family LLC filed its notice of appeal to this Court.

II. Standard of Review

“ ‘Where evidence is presented to the trial court ore tenus, a presumption of correctness exists as to the court’s conclusions on issues of fact... .’American Petroleum Equipment & Constr., Inc. v. Rancher, 708 So.2d 129, 132 (Ala. 1997).... Under the ore tenus rule of appellate review, this Court will affirm a trial court’s judgment if there is substantial evidence of record supporting that judgment. B.D. Nelson Land Dev., Inc. v. Jackson, 663 So.2d 932, 932 (Ala.1995).
“The presumption of correctness accorded a trial court’s judgment following a bench trial does not extend to its decisions on questions of law. Instead, this Court reviews such rulings on questions of law de novo. Ex parte Keelboat Concepts, Inc., 938 So.2d 922, 925 (Ala. 2005); Ex parte Graham, 702 So.2d 1215,1221 (Ala.1997).”
Van Hoof v. Van Hoof, 997 So.2d 278, 286 (Ala.2007). The same de novo standard applies to an appellate court’s review of a trial court’s application of the law to the facts. See, e.g., Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 417 (AÍa.1994).

III. Analysis

The Family LLC takes issue with the trial court’s conclusion that the Family LLC is dissolved and must wind up its affairs, and it disagrees with the trial court’s conclusion that the • Family LLC must return the 22 voting shares to the sisters on the ground that the sisters are the actual owners of that stock. The Family LLC first contends that several affirmative defenses bar the sisters from asserting that the Family LLC was dissolved upon L.B.’s death. The Family LLC then contends that, even if its affirmative defenses do not bar the sisters’ dissolution argument, the trial court erred in interpreting the LLC Law as effecting a dissolution of the Family LLC. Finally, the ■Family LLC contends that the trial court erred by enforcing the terms of the 1981 agreement in light of the terms of the 1998 cancellation agreement. We address each of these arguments in turn.

A. The Affirmative Defenses

As a threshold matter, we note that, in considering the affirmative defenses asserted by the Family LLC, it is important to keep in mind the nature of the sisters’ counterclaim with respect to the alleged dissolution of the Family LLC and the trial court’s order in response to that counterclaim. The Family LLC states that the sisters asserted “[a] counterclaim seeking the dissolution of the Family LLC.” (Emphasis added.) In point of fact, the sisters’ complaint does not ask the trial court to dissolve the Family LLC; it seeks an injunction to require the Family LLC to wind up its affairs in recognition of what *180 they argue is the LLC’s dissolution as a matter of law. Likewise, the trial court did not order the Family LLC to dissolve; it recognized the Family LLC as a dissolved company under the law and ordered it to wind up its affairs.
The first. affirmative defense asserted by the Family LLC is that the sisters’ “claim” of dissolution is barred by the doctrine of res judicata. The Family LLC argues that the continuation of the Family LLC was adjudicated in the “Decree of Final Settlement” of L.B.’s estate entered by the Montgomery Circuit Court on July 20, 2005. This is so, the Family LLC asserts, because that order approved the distribution of assets of L.B.’s estate noted in the petition for final settlement, and Exhibit A to the petition listed the Family LLC as an asset “on hand.” The Family LLC contends that it therefore continued to exist, with a membership interest, or a portion of L.B.’s membership interest, in it being distributed to each of L.B.’s four children upon L.B.’s death. (As will be discussed in Part III.B of this opinion, infra, the sisters contend that they and Louie inherited only “financial rights” in the Family LLC pending the wrapping up of its affairs following the dissolution that occurred upon L.B.’s death.) The Family LLC argues that the sisters could have asserted that the Family LLC was dissolved during the probate of L.B.’s will, but they did not do so.
In Equity Resources Management, Inc. v. Vinson, 723 So.2d 634, 635 (Ala.1998), this Court reviewed the four elements of the defense of res judicata: “ ‘(1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both actions.’ ” The Family LLC’s invocation of the defense of res judicata fails, at the least, because of the failure of the fourth element.
The issue presented in the present case, whether the Family LLC continued its normal existence following L.B.’s death or whether his death was an act of dissolution leaving for the. Family LLC no proper function other than winding up its affairs, was a not central or even a peripheral issue in the probate of L.B.’s estate. The mere listing in the petition for final settlement of the Family LLC as an asset “on hand” in the estate did not constitute a determination that L.B.’s children had acceded to the membership interest in the Family LLC that L.B. held during his life, as opposed to each of them merely acceding to a one-fourth interest in the financial rights that remained upon the extinguishment of L.B.’s membership interest in the Family LLC at his death. Thus, the circuit court’s entry of its “final decree” provides no basis for the Family LLC’s assertion of the defense of res judicata as to the issue of its dissolution.
[[Image here]]
Next, the Family LLC contends that the sisters’ “claim” for dissolution of the Family LLC is barred by the doctrine of laches. We first note that “[t]he applicability of the doctrine of laches is ‘dependent upon the particular facts and circumstances’ of each case,” and that “[t]he applicability of the doctrine is ‘committed to the sound discretion of the trial court.’ ” Horton v. Kimbrell, 819 So.2d 601, 606 (Ala.2001) (quoting Dear v. Peek, 261 Ala. 137, 141, 73 So.2d 358, 361 (1954), and Wallace v. Hardee’s of Oxford, Inc., 874 F.Supp. 374, 377 (M.D.Ala. 1995)). “[T]he person asserting the defense of laches [must] show (1) that the claimant delayed in asserting his or her right, (2) that the delay was inexcusable, and (3) that the delay caused the person asserting the defense undue prejudice.” Mills v. Dailey, 38 So.3d 731, 735 (Ala. *181 Civ.App.2008). The Family LLC contends that the sisters delayed 10 years in seeking a declaration of the dissolution of the Family LLC and that this delay prejudiced the Family LLC.
Again, however, the sisters do not seek in this action to dissolve the Family LLC. They seek, in effect, merely a recognition that the Family LLC was dissolved as a matter of law upon L.B.’s death and an appropriate order requiring the wrapping up of the affairs of Family LLC in recognition of that dissolution. In addition to this fact, however, the Family LLC does not establish that the delay it describes constituted the kind of change in circumstances the invocation of the doctrine of laches requires.
“ ‘ “ ‘Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as es-toppel against the assertion of the right. The disadvantage may come from loss of evidence, change of title, intervention of equities, and other causes; but, when a court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief.’ Stiness, J., in Chase v. Chase, 20 R.I. 202, 37 A. 804 [ (1897) ].” 5 Pom. Eq. Jur., § 21.
“ ‘ “Laches, as has been well said, does not, like limitation, grow out of the mere passage of time, but it is founded upon the inequity of permitting the claim to be enforced — an inequity founded upon some change in the condition or relation of the property, or the parties. — Galliher v. Cadwell, 145 U.S. 368 [12 S.Ct. 873, 36 L.Ed. 738 (1892) ].” First Nat. Bank [Waller ] v. Nelson, 106 Ala. 535, 18 So. 154 [ (1895) ]. See, also, Wise v. Helms, 252 Ala. 227, 230, 40 So.2d 700 [(1949)]; Meeks v. Meeks, 251 Ala. 435, 437, 37 So.2d 914 [ (1948) ]; Fanning v. Fanning, 210 Ala. 575, 576, 98 So. 804 [ (1924) ].’ ”
Sykes v. Sykes, 262 Ala. 277, 281-82, 78 So.2d 273, 277 (1954) (quoting Hauser v. Foley & Co., 190 Ala. 437, 440-41, 67 So. 252, 253 (1914) (emphasis added)).
No condition between the parties changed between 2000 and 2010 that would make raising the issue of the dissolution of the Family LLC in 2010 inequitable. The passage of time did not make it more difficult for the Family LLC to address its legal existence; if anything, its continued operation strengthened its claim to legal existence.[6]
*182 The Family LLC also argues that the sisters’ “counterclaim seeking dissolution” should be barred by the doctrine of equitable estoppel.
“To establish the essential elements of equitable estoppel, [the proponent] must show the following:
“(1) That ‘[t]he person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on;’
“(2) That ‘the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon [the] communication;’ and
“(3) That ‘the person relying would be harmed materially if the actor is later permitted to assert a' claim inconsistent with his earlier conduct.’ ”
Lambert v. Mail Handlers Benefit Plan, 682 So.2d 61, 64 (Ala.1996) (quoting General Elec. Credit Corp. v. Strickland Div. of Rebel Lumber Co., 437 So.2d 1240, 1243 (Ala.1983)).
The elements of equitable estoppel are not present in this case. Among other things, testimony from the sisters indicates that the sisters were not aware that the Family LLC was dissolved until they consulted counsel following the initiation of this litigation by the Family LLC. Thus, the evidence does not indicate that they had a knowledge of the facts and intended to mislead the Family LLC. Further, the evidence does not show that the sisters affirmatively agreed to the continuance of the Family LLC; thus, they did not communicate with the Family LLC in a misleading way.[7]
Further, it cannot be said that the Family LLC (or Louie) lacked knowledge of facts in this situation. If anything, the Family LLC had access to more information than did the sisters, and. the Family LLC and its manager should have been aware of'the law that governed the existence of the Family LLC. Nor do we see in this case the material harm required under the third element of equitable estoppel as described above. We conclude, therefore, that equitable estoppel is not applicable in this case.
Next, the Family LLC contends that the sisters’ “counterclaim seeking dissolution” is barred by the doctrine of “judicial estoppel.”
“ ‘The doctrine of judicial estoppel “applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system[,] while equitable estoppel focuses on the relationship between the parties to the prior litigation.” ’ Jinright v. Paulk, 758 So.2d 553, 555 (Ala.2000) (quoting Selma Foundry & Supply Co. ■ v. Peoples Bank & Trust Co., 598 So.2d 844, 846 (Ala.1992), quoting in turn Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir.1988)).”
Ex parte First Alabama Bank, 883 So.2d 1236,1241 (Ala.2003).
*183 “[F]or judicial estoppel to apply (1) ‘a party’s later position must be “clearly inconsistent” with its earlier position’; (2) the party must have been successful in the prior proceeding so that ‘judicial acceptance of an inconsistent position in a later proceeding would create “the perception that either the first or second court was misled” ’ (quoting Edwards v. Aetna Life his. Co., 690 F.2d 595, 599 (6th Cir.1982)); and (3) the party seeking to assert an inconsistent position must ‘derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.’ New Hampshire v. Maine, 532 U.S. [742,] 750-51, 121 S.Ct. 1808 [ (2001) ].”
Id. at 1244-45.
In contending that the sisters’ position is barred by the doctrine of judicial estoppel, the Family LLC essentially reargues its res judicata defense by another name, arguing that the sisters’ current position is at odds with the position they held in the estate proceeding. If anything, framing this defense in terms of judicial estoppel fails more readily than the Family LLC’s assertion of the defense of res judicata. The sisters never contended in the estate proceeding that the Family LLC should continue or that they were members of the Family LLC. We see no basis for the assertion of the defense of judicial estop-pel.
Finally, the Family LLC contends that the sisters “have waived their right to seek dissolution” of the Family LLC. The thrust of this argument is the same as that of the Family LLC’s other affirmative-defense claims, and the argument suffers from essentially the same deficiencies as do those claims. Among other things, as has been noted, the sisters do not “seek dissolution” of the Family LLC in this case but, instead, ask the trial court to recognize that the Family LLC was dissolved as a matter of law upon L.B.’s death. We see no right regarding the dissolution of the LLC that has been waived by the sisters.

B. Dissolution of the Family LLC

We turn next to the Family LLC’s contention that the trial court erred in concluding that the Family LLC was dissolved in 2000 upon L.B.’s death. We conclude that the circuit court correctly reached this conclusion through the application of certain portions of the LLC Law.
The LLC Law distinguishes between membership in an LLC and “financial rights” in an LLC. It defines a “member” of an LLC as “[a] person reflected in the required records of a limited liability company as the owner of some governance rights of a membership interest in the limited liability company.” § 10A-5-1.02(7), Ala.Code 1975. “Governance rights” are defined as “[a]ll a member’s rights as a member of a limited liability company except financial rights, including without limitation, the rights to participate in the management of the limited liability company and to bind the limited liability company as provided in Section 10A-5-3.03.” § 10A-5-1.02(5), Ala.Code 1975 (emphasis added). “Financial rights” are “[r]ights to a. share in profits and losses as provided in Section 10A-5-5.03, b. receive interim distributions as provided in Section 10A-5-5.04, and c. receive termination distributions as provided in Section 10A-5-7.05.” § 10A-5-1.02(3), Ala.Code 1975.
The Family LLC contends that Louie and the sisters are members of the Family LLC. In contrast, the sisters contend that the Family LLC dissolved upon L.B.’s death and that they and Louie inherited merely the “financial rights” associated with the membership held by L.B. in the Family LLC before his- death. The sisters contend that they never agreed to become, *184 and never became, members of the Family LLC. The trial court agreed with the sisters’ position.[8]
The articles of organization for the Family LLC list L.B. as the only “member” of the Family LLC. They list L.B. and Louie as managers of the LLC. Section 10A-5-6.06, Ala.Code 1975, of the LLC Law provides:
“(b) Subject to contrary provisions in the operating agreement, or written consent of all members at the time, a person ceases to be a member upon the occurrence of one or more of the following events listed in the following subdivision or paragraphs:
“(3) In the case of a member who is an individual:
“a. The member dies.”
Section 10A-5-7.01, Ala.Code 1975, provides:
“A limited liability company is dissolved and its affairs shall be wound up upon occurrence of the first of the following events:
“(3) When there is no remaining member, unless either of the following applies:
“a. The holders of all the financial rights in the limited liability compány agree in writing, within 90 days after the cessation of membership of the last member, to continue the legal existence and business of the limited liability company and to appoint one or more new members.
“b. The legal existence and business of the limited liability company is continued and one or more new members are appointed in the manner stated in the governing documents.”
Obviously, L.B. ceased to be a member of the Family LLC upon his death on August 18, 2000. The Family LLC does not contend that anyone else had become a member of the Family LLC before L.B.’s death.
The Family LLC argues, however, that Louie and the sisters became members of the LLC as a result of a transfer of membership interest made by Louie, in his capacity as personal representative of L.B.’s estate. In support of this position, the Family LLC relies upon § 10A-5-6.04(a)(1), Ala.Code 1975, which provides:
“(1) If a member who is an individual dies or if a court of competent jurisdiction adjudges a member to be incompetent to manage the member’s person or property, the member’s personal representative, conservator, legal representative, heirs, or legatees may exercise all the member’s financial rights for the purpose of settling the member’s estate or administering the member’s property, including any power the member had to transfer the membership interest.”
(Emphasis added.) The Family LLC contends that § 10A-5-6.04(a)(l) empowered Louie to transfer his father’s membership interest in the Family LLC to himself and his sisters. The Family LLC argues that this is what Louie did when he obtained an employer-identification number necessary for a multimember limited liability company, opened a bank account for the dividends received on the shares of stock in *185 Whitfield Foods held by the Family LLC, and worked with accountants to establish capital accounts for himself and his sisters.
There are several problems with this argument. To begin with, it is important to note that § 10A-5-6.04(a)(l) does not state that the personal representative of the estate of a member of a limited liability company becomes a member of the limited liability company upon the member’s death; it states that the personal representative may exercise the financial rights of the member. As discussed below, it provides for this exercise for only a limited purpose.
That said, the argument made by the Family LLC misunderstands the relative roles of the provisions of § 10A-5-6.04 and those of § 10A-5-7.01(3). The latter provision addresses the circumstances under which a limited liability company that “is dissolved” because “there is no remaining member” may nonetheless remain in existence. Specifically, § 10A-5-7.01(3) specifies only two exceptions to the general rule that the limited liability company “is dissolved” when there is no remaining member. Again, this section begins by clearly and affirmatively stating that
“[a] limited liability company is dissolved and its affairs shall be wound up upon occurrence of the first of the following events:
(3) "When there is no remaining member, unless either of following applies. ...”
Section 10A-5-6.04(a)(l), on the other hand, has a different purpose. Its concern is with the decedent member’s “financial rights” as and to the extent those rights exist apart from other aspects of the membership in the limited liability company previously held by the decedent. Moreover, its purpose is to allow a personal representative to exercise those financial rights only “for the purpose of settling the member’s estate or administering the member’s property,” not administering or effecting the continued existence of the limited liability company itself.
Granted, the final clause of § 10A-5-6.04(a)(1) makes reference to the “power the member had to transfer the membership interest.” This reference, however, is included in a conditional clause as a description of one of the powers held by the personal representative in relation to “the member’s financial rights ” only. That is, the clause is intended simply to explain that the personal representative’s exercise of the member’s financial rights (again, for the limited estate-administration purposes emphasized above) includes the power to transfer those rights if and to the extent the member had the power during his or her life to transfer his or her interests to another. Thus it is that the commentary to the section under which this provision was previously codified, § 10-12-34(a)(l), AIa.Code 1975,[9] states that “[t]he personal representative may exercise only the member’s financial rights and does not have a right to participate in management [of the limited liability company].”
In short, we are clear to the conclusion that neither L.B.’s estate nor Louie as the personal representative of L.B.’s estate nor any transferee or appointee of Lodie in his capacity as the personal representative of the estate became a “member” of the Family LLC upon L.B.’s death as a result of or pursuant to any authority granted by the provisions of § 10A-5-6.04(a)(l).
The Family LLC must prevail, if at all, on its argument that it continued its normal existence following L.B.’s death by demonstrating that one of the two excep- *186 tions described in subparagraphs a. and b. of § 10A-5-7.01(3) is applicable. The Family LLC presents no argument as to subparagraph b. but does contend that the exception described in subparagraph a. is applicable.
Subparagraph a. requires that “[t]he holders of all the financial rights” in the limited liability company agree in writing to continue the legal existence and business of the limited liability company and to appoint one or more new members. The Family LLC contends that this requirement was met when Louie, as L.B.’s personal representative, probated L.B.’s will and, during the pendency of L.B.’s estate proceeding, established a new employer-identification number for the Family LLC, opened a bank account, and worked with accountants to establish capital accounts for himself and his sisters. In those actions, we see no “agree[ment] in writing” of the nature contemplated by § 10A-5-7.01(3)a. Moreover, even if those actions somehow did constitute an “agreement in writing” for purposes of § 10A-5-7.01(3)a., they were undertaken by Louie only in his capacity as personal representative, when it was Louie in his individual capacity, and his sisters, who acceded to the financial rights of L.B. in the Family LLC under his will and who “all” would have had to enter into the agreement in. order to satisfy the terms of § 10A-5-7.01(3)a.[10]
The Family LLC asserts that the sisters’ consent to the final settlement of L.B.’s estate constituted such a writing, but, as discussed, the final settlement clearly was not directed to that purpose. (In addition, all the sisters testified that they had no idea the final settlement represented such consent.) Nor did the actions of the sisters in respect to such matters as accepting dividends generated by Whitfield Foods constitute an “agreement in writing” as contemplated by the statute. (For that matter, and even to the extent those distributions passed through the Family LLC, the act of accepting such distributions did not justify a conclusion that the sisters had acted in a manner explained only by their consent to becoming members in the LLC, because they were fully entitled to such distributions based solely on their status as holders of “financial rights” in the Family LLC.)
Our understanding of the meaning of the various provisions of the LLC Law as set forth above is a function of the plain language used in those various statutory provisions. This understanding, however, is fully buttressed and corroborated by the inherent nature of limited liability companies and by fundamental principles attendant to their formation and the acquisition of membership status in them. Such principles require a rejection of the notion embedded throughout the Family LLC’s attempt to interpret those provisions differently — that somehow the sisters could agree to the continuation of the Family LLC and/or become members of it by implication or by Louie’s actions rather than their own actions and consent. The nature of limited liability companies and the fundamental principles discussed below do not allow for such possibilities.
In Steele v. Rosenfeld, LLC, 936 So.2d 488 (Ala.2005), this Court discussed whether an individual could become a member of a limited liability company by implication. The Steele Court noted that this Court has *187 “ ‘held that a partnership “is never established by implication or operation of law,” ’ ” and it concluded that the provisions concerning limited liability companies “are fully consistent with this rule” and that there is “no reason to apply a different rule in the context of a limited liability company. See Ala.Code 1975, § 10-12-8(a) [recodified at § 10A-5-I.06(a) ] (providing that, for statutory purposes, limited liability companies are generally treated as partnerships).” 936 So.2d at 495 (quoting Vergas v. Waterman Building P’ship, 613 So.2d 383, 389 (Ala.1993), quoting in turn Waters v. Union Bank of Reptan, 370 So.2d 957, 960 (Ala.1979)). More specifically, the Steele Court concluded that, “[ujnder § 10-12-33(a)(l) [now codified at § 10A-5-6.03], membership accretion must be ‘evidenced by a written instrument, dated and signed’ by all the existing members.” 936 So.2d at 495. The law requires written documentation of consent to membership in a limited liability company. At least as to the sisters, there is no evidence in writing indicating that they consented to become members of the Family LLC. As the trial court concluded, the Family LLC failed to prove
“that the [sisters] can be forced to be members of the [Family] LLC and their stock remain in that entity under their brother’s control. The statutory scheme clearly envisions that membership in an LLC must be sought and must be consented to; it does not provide that people who do not desire to be in business with each other can be made to do so without their consent.”
Because there was no agreement in writing by all the holders of the financial rights in the Family LLC to continue the Family LLC’s business, the exception to dissolution prescribed by § 10A-5-7.01 (3)a. is not applicable. As the trial court concluded, the Family LLC “is dissolved and its affairs shall be wound up.”[11] Section 10A-5-7.05, Ala.Code 1975, requires that, “[u]pon the winding up of a limited liability company, the assets of the limited liability company shall be distributed....” Thus, the trial court also correctly required the Family LLC to provide an accounting of its finances and to distribute its assets, specifically,, the stock held by it in Whitfield Foods, in equal shares to L.B.’s four children.

C. Distribution of the 22 Voting Shares

The Family LLC contends that, even if the trial court was correct in finding that the Family LLC had dissolved upon L.B.’s death and in ordering it to wind up its affairs, the trial court still erred in ordering the Family LLC to distribute the 22 voting shares solely to the sisters. The Family LLC argues that the sisters’ claims for the return to them of the 22 voting shares are based upon the 1981 agreement. The Family LLC argues that the evidence at trial revealed that, effective August 31, 1998, the 1981 agreement was canceled by the 1998 cancellation agreement so that no party had any “further obligation” under that agreement. The Family LLC states that, despite the cancellation of any further obligations under the 1981 agreement, the trial court nonetheless “ordered the Family LLC to effectively honor the ‘Right to Reacquire The Stock’ provision in the canceled Stock Purchase Agreement and to distribute the *188 22 Voting Shares to the [sisters,] who were, in turn, ordered to transfer the 44 shares of non-voting stock into the Family •LLC.” Id.
It appears that the trial court concluded that the 1998 cancellation agreement constituted a rescission of the 1981 agreement. “When a rescission of a contract occurs ... ‘the proper remedy is to restore all parties to the status quo ante, and each party should be placed in the position that party would have occupied had the conveyance not been made.’ ” Kellis v. Estate of Schnatz, 983 So.2d 408, 413 (Ala.Civ.App.2007) (quoting Clark v. Wilson, 380 So.2d 810, 812 (Ala.1980)). Accordingly, the trial court ordered the sisters to return the 44 shares of Class B nonvoting stock to the Family LLC in exchange for receiving the 22 voting shares.
As we noted in the rendition of the facts, the 1998 cancellation agreement provided: “All of the undersigned agree that the foregoing stock purchase agreement dated April 18, 1981 is canceled and is void effective on this date and no party has any further rights or obligations herein.” The Family LLC contends that the phrase “no party has any further rights or obligations” under the 1981 agreement means that the parties were merely canceling all unperformed obligations under that agreement, including the “Right to Reacquire the Stock” provision therein. This would have meant that L.B. would keep 22 voting shares and the sisters would keep the 44 nonvoting shares.
“It is well settled that parties to a written contract may by mutual consent and without other consideration rescind their contract. Watson v. McGee, 348 So.2d 461 (Ala.1977). Whether the parties rescinded their contract poses a question of fact to be determined from their intent as clearly manifested in their words, acts, or conduct. San-Ann Service, Inc. v. Bedingfield, 293 Ala. 469, 305 So.2d 374 (1974).”
Henderson v. Winkler, 454 So.2d 1358, 1361 (Ala.1984) (emphasis added). See also Sartr-Ann Serv., Inc. v. Bedingfield, 293 Ala. 469, 472, 305 So.2d 374, 377 (1974) (stating that “a contract may be rescinded or discharged by acts or conduct of the parties inconsistent with the continued existence of the contract and mutual assent to abandon a contract may be inferred from the attendant circumstances and conduct of the parties ” (emphasis added)).
In this case, the parties’ “words, acts, [and] conduct” all support the conclusion that the parties to the 1998 cancellation agreement did not intend to rescind the 1981 agreement in its entirety. First, the words of the 1998 cancellation agreement emphasized above are at least consistent with a cancellation not intended to take effect retroactively, but to be effective only “on this date” going forward in the sense indicated by the ensuing language agreeing that the parties were to have no “further rights or obligations.” Indeed, to state that “no party has any further rights or obligations herein” appears to be an obtuse way, at best, to say that the parties do in fact have some further right and obligation, i.e., to receive and tender certain stock shares between them.
In contrast, the 1981 agreement specifically detailed the shares of stock to be exchanged, including explaining the procedure for L.B.’s attorney to transfer the 44 shares of Class B nonvoting stock to the sisters and providing the stock-certificate numbers representing those shares. There is no dispute that the exchange of stock between the parties occurred in 1981. The 1998 cancellation agreement did not provide any explanation of how an exchange of stock between the parties should occur. Indeed, it did not contain *189 even the simplest expression of the notion that the parties were to exchange any shares of stock between them. Again, it simply stated that “no party has any further rights or obligations herein.”
That they would in fact have “no ... further rights or obligations herein” is what the subsequent “acts and conduct” of the parties also indicate the parties believed to be true. The sisters obviously did not, in the wake of their execution of the 1998 cancellation agreement, receive from their father a return of the 22 voting shares then held by him. The record contains no evidence indicating that during this time frame the sisters raised any objection or made any inquiry of L.B. concerning an anticipated return to them of the 22 voting shares. Nor did the sisters during the weeks and months immediately after the execution of the 1998 cancellation agreement tender to L.B. the 44 shares of Class B nonvoting stock held by them.
Instead, approximately one month after the 1998 cancellation agreement was executed, L.B. formed the Family LLC and transferred all the Class A voting stock of Whitfield Foods in his possession — including the 22 voting shares — into the Family LLC. Obviously, this action by L.B. was inconsistent with an intention to rescind the entire 1981 agreement; in the event of a rescission of the entire agreement, the 22 voting shares would not have been L.B.’s to transfer into the Family LLC. In other words, L.B.’s actions are consistent with an intention simply to void the “Right to Reacquire the Stock” provision in the 1981 agreement given that that provision would have interfered with L.B.’s plan to transfer the 22 voting shares to the Family LLC and keep them there.
Of course, L.B.’s actions in these respects were unilateral, and the record indicates that the sisters were not immediately aware of them. In and of themselves, therefore, they would not have the import suggested if we assume that it is not necessary to reconcile the 1998 cancellation agreement and L.B.’s subsequent actions because he simply acted contrary to the intention expressed in the agreement. Such an assumption would be more feasible if L.B.’s actions were the only collateral acts of the parties evidencing their understanding of the cancellation agreement. They are not.
In addition to the failure of the sisters to act in the wake of their signing the 1998 cancellation agreement as if they anticipated a return of the 22 voting shares, certain actions by the sisters in the years following the execution of the 1998 cancellation agreement indicate that they did not understand or treat the 1998 cancellation agreement as a rescission of the 1981 agreement in its entirety. According to their own testimony, at least one of the sisters knew in early 2000, before L.B.’s death, that the 22 voting shares were held by the Family LLC. By 2007, all the sisters knew that this was the case. Moreover, two of the sisters had watched Louie on multiple occasions vote the 22 voting shares in meetings of the Whitfield Foods’ board of directors. The sisters never raised any objection to these practices or demanded the return of the 22 voting shares from L.B. or from Louie until May 19, 2010, when they wrote a letter to Louie.
Further still, even in the May 19, 2010, letter and the two subsequent letters to the same effect, and in their counterclaim, the sisters expressly based their right to the 22 voting shares on the “Right to Reacquire the Stock” provision of 1981 agreement. They did not rely upon the 1998 cancellation agreement.
Likewise, at no time during the 12 years from the date of the 1998 cancellation agreement to the sisters’ first letter to *190 Louie demanding the return of the 22 voting shares did the sisters ever attempt to return the 44 Class B nonvoting shares they had received in exchange for the 22 voting shares. To the contrary, they regularly accepted the financial benefits attendant to ownership of those 44 shares.
Applying the above-described principles regarding rescission of contracts to the undisputed “words, acts, [and] conduct” of the parties, we hold that the 1998 cancellation agreement did not operate to effect a rescission of the 1981 agreement in its entirety. Rather, it simply canceled any further obligations of the parties under the 1981 agreement. Accordingly, the trial court erred in ordering the Family LLC to return the 22 voting shares to only the sisters and ordering the sisters to return the 44 Class B nonvoting shares to the Family LLC. Instead, the 22 voting shares are due to be distributed by the Family LLC in .the same manner as the other shares of stock in Whitfield Foods held by the Family LLC, i.e., in four equal shares to Louie and each of the sisters. Likewise, the sisters are not required to return the 44 Class B nonvoting shares to the Family LLC.

IV Conclusion

We conclude that the trial court erred in ordering the Family LLC to return the 22 voting shares to only the sisters, and we reverse that portion of its judgment doing so. The 22 voting shares are due to be distributed in four equal shares to Louie, Virginia Whitfield, Valerie Puckett, and Almeida Strawder. We affirm the portion of the trial court’s judgment finding that the Family LLC is dissolved and ordering that the Family LLC must wind up its affairs, provide an accounting of its assets, distribute those assets in equal shares to Louie, Virginia Whitfield, Valerie Puckett, and Almeida Strawder, and file articles of dissolution in the office of the judge of probate of Montgomery County. We remand this case for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MOORE, C.J., and MAIN and BRYAN, JJ., concur.
BOLIN, J., concurs in the result.

. Louie and the sisters have different mothers.

. It appears that a total of over 2,500 shares of Class A voting stock in Whitfield Foods were issued and outstanding at all times relative to the dispute before us.

. The Alabama Limited Liability Company *176 Act, codified at § 10-12-1 et seq., Ala.Code 1975, was enacted in 1997 and became effective on January 1, 1998. It was amended and its provisions, renumbered by Act No. 2009-513, Ala. Acts 2009, which became effective on January 1, 2011. Act No. 2009-513 renamed the law the Alabama Limited Liability Company Law, § 10A-5-1.01 et seq., Ala. Code 1975 ("the LLC Law”). The trial court in its judgment and the parties in their briefs cite and quote the provisions of the LLC Law, which became effective after the events in issue here. The parties agree that the provisions of law applicable in this case are not substantively different than the provisions in force when the events in issue occurred. Where appropriate, however, this opinion will refer to provisions of the Alabama Limited Liability Company Act.

. In 2001, L.B.’s wife at the time of his death had had the administration of L.B.'s estate removed- to the Montgomery Circuit Court.

. It is unclear, but immaterial, whether the trial court could have used the date July 20, 2005, in this portion of its judgment, that being the date on which it entered its "Decree on Final Settlement” of L.B.'s estate, according to the record before us.

. The Family LLC contends that the delay caused prejudice to Louie, not to the Family LLC. Louie was dismissed as a defendant to the sisters' claims, however, so it is irrelevant whether the delay prejudiced him. Even if prejudice to Louie did matter, the Family LLC’s claims of prejudice do not withstand scrutiny.
The Family LLC contends that Louie was prejudiced in not being able to locate documents that could prove that the sisters acquiesced to the continuation of the Family LLC and that he was a member of the LLC.
But Louie did not testify that he had such documents and had lost them; he testified that he could not find any such document and that he “could have lost it.” (Emphasis added.) He never stated that he had seen such a document. The trial court understood Louie’s testimony to mean that no such document existed.
The Family LLC also argues that Louie was prejudiced by spending 10 years’ time and effort managing the Family LLC. Even according to Louie’s own testimony, however, this "work” did not involve much time at all. *182 It consisted of passing through the dividends from Whitfield Foods to shareholders and having an accountant distribute. K-l tax forms. Thus, the Family LLC failed to establish that the sisters’ delay caused even Louie to be in any materially different position than he would have been in had L.B.’s death been recognized by the parties at the time it occurred as an act of dissolution of the Family LLC.

. This issue is discussed more fully in Part III.B, infra.

. Among other things, the trial court correctly noted that “the statutory scheme clearly envisions that membership in an LLC must be sought and must be consented to; it does not provide that people who do not desire to be in business with each other can be made to do so without their consent.” In this regard, an LLC is similar to a partnership. See discussion, infra.

. The wording of § 10-12-34(a)(l) is identical to that of § 10A-5-6.04(a)(1).

. Again, the authority granted a personal representative under § 10A-5-6.04(a)(l) is only for the purpose of allowing a personal representative to take steps necessary to “settl[e] the member's estate” and "administer[] the member’s property,” not to allow the personal representative to determine whether the limited liability company continues in its normal existence and business and, if so, who will be its members.

. The operating agreement of the Family LLC does not purport to provide for any result different than the result required by the statute, stating that, “[u]pon the occurrence of a Dissolution Event, the Company shall cease carrying on its business, except insofar as may be necessary for the winding up thereof.” Operating Agreement, Art. XVI., § 16.2.