BRYAN, Justice.
This case involves the ownership interests in and control of Autauga Automotive, LLC (“Autauga Automotive”), a limited liability company that owns and operates a Ford Motor Company (“Ford”) franchise in Prattville known as Gilmore Ford. Frank A. Moultrie appeals from a judgment of the Autauga Circuit Court holding that the interests of Charles O. Wall II and Moultrie in the profits and losses of Autauga Automotive were 90% and 10%, respectively, but that Moultrie was divested of his 10% interest for failing to pay a required capital contribution.[1] We affirm in part, reverse in part, and remand the cause to the circuit court with instructions.

I. Facts and Procedural History

In early 2009, Wall and Jesse Mariner began negotiations to purchase the assets of Gilmore Ford, an existing automobile dealership in Prattville. As part of their planned purchase of Gilmore Ford, Wall and Mariner applied to Ford to become a franchise dealership, but Ford rejected their application because of their lack of experience. On July 8, 2009, Wall and Mariner filed articles of organization for Autauga Automotive, which listed Wall and Mariner as the only members, in the Au-tauga Probate Court. Mariner was named the manager of Autauga Automotive. Wall and Mariner also signed an operating agreement for Autauga Automotive that provided in paragraph IV that Wall and Mariner “agree to share in all post formation capital contributions, profits, and surplus of [Autauga Automotive] according to their percentage of ownership.” Paragraph IV stated that Wall and Mariner each owned an undivided 50% interest in Autauga Automotive. Paragraph VII of the operating agreement, which concerns “Division of Profits and Losses,” provides:
“Each of the owners shall own an interest in [Autauga Automotive] as set forth in Paragraph IV, entitled ‘Capital Contributions,’ except as the same may hereafter vary or change as provided in Paragraph V, entitled ‘Contributions of Additional Capital.’ All profits of [Au-tauga Automotive] shall be shared by each of said members according to the percentage of interest each member owns.”
Paragraph VIII of the operating agreement, which concerns the “Rights and Duties of the Parties,” provides:
“Company decisions and actions shall be decided by a majority in interest of the members, at a meeting regularly called with notice to all members. For purposes of determining a ‘majority in interest’, a member’s interest will be his/her interest in profits and losses as set forth in Paragraph VII, and a major *831 ity will mean fifty-one percent (51%) or more.”
Initially, Mariner contributed $300,000 in capital to Autauga Automotive, and Wall contributed approximately $5,000 in capital with the intention of paying Mariner the rest of Wall’s part of the capital contribution from Wall’s share of the earnings of Autauga Automotive.
At some point before Mariner and Wall formed Autauga Automotive, Mariner and Wall approached Moultrie, who had experience in the automobile-sales industry with other dealerships, to help with their application to become a Ford franchise dealership. According to Mariner, he and Wall offered Moultrie “10% of the company for his signature for Ford.” On July 17, 2009, Wall submitted another dealer application to Ford that indicated that Mariner and Wall each owned a 45% interest in Autau-ga Automotive and that Moultrie owned a 10% interest.[2] Ford rejected the application because of Mariner’s “background.” At that point, the parties realized that Mariner could not be involved in Autauga Automotive “on paper,” and they decided that Mariner had to be removed as a member of Autauga Automotive.
On July 20, 2009, Mariner, Wall, and Moultrie signed an amendment to Autauga Automotive’s articles of organization that stated: “[T]he members unanimously voted and have received approval of the Manager for Jesse Mariner to transfer his 50% interest and for Charles O. Wall to transfer 1% of his interest in Autauga Automotive, LLC to: Frank Moultrie.”[3] The amendment also provided that Wall replaced Mariner as the manager of Autauga Automotive. At the same time, Mariner, Wall, and Moultrie filed an amendment to Autauga Automotive’s operating agreement that modified paragraph IV of the agreement as follows:
“The undersigned owners agree that Jesse J. Mariner has transferred his 50% interest and Charles O. Wall is transferring 1% of his interest in Autau-ga Automotive, LLC, to Frank Moultrie. As such, the owners agree to share in all post formation capital contributions, profits, and. surplus of [Autauga Automotive] according to their percentage of ownership. The amended ownership interest in the business and company as follows: Frank Moultrie 51% [and] Charles O. Wall 49%.”
According to Mariner and Wall, this agreement was only to placate Ford and their “agreement of men” was still that profits and losses would be split 45%, 45%, and 10%, with Moultrie’s interest in Autau-ga Automotive being only 10%. Wall sent an amended prospective dealership application to Ford on July 27, 2009, that reflected Moultrie’s 51% interest and Wall’s 49% interest. That application was approved.
Because on paper Mariner was no longer a member of Autauga Automotive and because he had contributed a significant amount of capital to Autauga Automotive, Mariner wanted reassurance that he was still “part of the deal.” According to Wall- and Mariner, Moultrie drew up an agreement that was supposed to reflect the actual agreement of the parties, that is, that Moultrie had only a 10% interest in Autau-ga Automotive. That agreement, which was dated August 24, 2009 (“the August *832 2009 agreement”) and was signed by Wall, Mariner, and Moultrie, stated:
“Agreement For Purchase of Gilmore Ford Assets & Franchise by Autauga Automotive LLC[.] Autauga Automotive LLC & Jesse Mariner & Charlie Wáll & Frank Moultrie Agree to:
“A Sell 10% of Franchise & Autau-ga Automotive LLC to Frank Moul-trie for $1.00 and other considerations such as franchise approval & guarantees to Ford Motor Co.
“B Frank Moultrie retains the 10% for [five] years & participates accordingly w[ith] any & all profit distributions as 10% owner of Autauga Automotive LLC/Ford franchise.
“C At the end of the [five] years Autauga Automotive, LLC has the option to repurchase Frank Moultrie’s 10% at book value of the LLC & Ford franchise. At the end of the [five] years a condition of the buyout must be that Frank Moultrie is released from any & all guarantees to Ford Motor Co. & Ford Motor Credit and any and all other guarantees associated w[ith] [the] LLC & franchise.”
On September 15, 2009, Wall and Moul-trie signed an application for a wholesale financing and security agreement with Ford, which is essentially a line of credit from Ford to use to purchase inventory for the dealership. On October 1, 2009, Wall and Mariner took out a $200,000 loan from River Bank & Trust for use by Autauga Automotive, and, on the same day, Autau-ga Automotive purchased the assets of Gilmore Ford. Also on October 1, 2009, Wall and Moultrie signed a sales and service agreement with Ford, which established Autauga Automotive as an authorized Ford dealership. In that agreement, Moultrie is recognized as having 51% and Wall 49% of “interest equity voting.”
Although Mariner was not a member of Autauga Automotive, he worked for Gilmore Ford and “ran the sales side of the store” from Autauga Automotive’s purchase of the dealership' until approximately July or August 2010. During that time, Autauga Automotive operated in accordance with the August 2009 agreement. Moultrie did not work at the dealership, and he did not maintain an office at the dealership. Moultrie was supposed to transfer ownership of inventory from his other dealerships and cash to Autauga Automotive in the amount of $1,003,300 as a capital contribution, but he never did so, and he never contributed any other capital.[4]
In December 2009, Mariner, Wall, and Moultrie attended a year-end tax-planning meeting for Autauga Automotive, along with Annamarie Jones, a certified public accountant hired by Autauga Automotive, and Michael Frakes, the comptroller of Gilmore Ford. Moultrie told Jones that he was not an active member of the business and that he should be allocated only 10% of Autauga Automotive’s profits. Jones asked for documentation to support that division of profits because it was a deviation from the terms of the operating agreement, but no one at the meeting mentioned the August 2009 agreement between Wall, Moultrie, and Mariner. Jones prepared K-l forms for Wall and Moultrie that allocated 90% of the profits of Autau-ga Automotive to Wall and 10% of the profits of Autauga Automotive to Moultrie.
Jones conducted another tax-planning meeting in April 2010. Although Moultrie was invited to this meeting, he did not *833 attend. Wall and Frakes were present at this meeting, and Jones was instructed to make the same allocation of profits and losses as she had made in 2009. Jones again asked for documentation to support this allocation because it was not the allocation provided for in the operating agreement, but Wall told her that he was “getting that.” Jones prepared 2010 K-l forms for Wall and Moultrie that once again allocated 90% of the profits to Wall and 10% of the profits to Moultrie.
By October 2010, Mariner was no longer working at the dealership, and, at that time, Moultrie had replaced Mariner as a guarantor on the $200,000 note Wall and Mariner had executed in October 2009. After Mariner stopped working, at the dealership, Wall and Moultrie began repaying Mariner for the capital he had contributed to Autauga Automotive. In May 2011, Wall and Moultrie signed as guarantors of a $400,000 note they used, in part, to repay Mariner for his capital contribution to Autauga Automotive.
On April 6, 2011, Jones received a call from Vince Studeman, Moultrie’s personal accountant, disputing the allocation of profits and losses in the 2010 tax returns. However, Jones had already given the returns to the parties for filing and, apparently, the 2010 tax returns were not modified before they were filed. In September 2011, Jones attended a meeting with Wall, Frakes, and Moultrie, but the dispute about allocation of profits and losses was not resolved. Jones asked Wall for documentation supporting the 90/10 allocation of profits and losses, but Wall did not tell her about the August 2009 agreement. At this meeting, Moultrie stated that he believed he was entitled to 51% of “everything,” not just capital.
On October 5, 2011, Moultrie went to the Gilmore Ford dealership and asked Wall to sign five signature pages and refused to tell Wall what he was agreeing to by signing those pages. Wall refused to sign the pages and left the premises. After Wall left, Moultrie told Frakes that if Wall did not sign those signature pages by the next morning, he was going to have Wall removed as the manager of Autauga Automotive. Moultrie’s brother eventually emailed Frakes 80 pages of loan documents that were connected to the 5 signature pages. Wall agreed to sign for the loan, which indebted Autauga Automotive in the amount of $800,000 for the benefit of other automobile dealerships that Moultrie was connected to, on the condition that Moul-trie agree to sell his interest in Autauga Automotive. On October 6, 2011, Moultrie signed a letter of intent to sell his “51% interest” in Autauga Automotive to Wall on January 2, 2012, and it indicated that the “agreed buyout amount” would be determined at a later date.
On November 21, 2011, Moultrie sent Wall a “Notice of Special Meeting of Members of Autauga Automotive, LLC.” The meeting was scheduled for December 5, 2011, and Moultrie indicated in the letter that the purpose of the meeting was “to elect a managing agent/member for the next year by a majority vote of the members” and “to discuss any inaccuracies in the tax returns signed by Charles Wall for the comphny, and the manner of correcting any inaccuracies.” Moultrie signed the letter as “Majority Member.”
On December 1, 2011, Wall and Autauga Automotive (hereinafter referred to collectively as “the plaintiffs”) filed a verified complaint in the Autauga Circuit Court seeking a temporary restraining order (“TRO”) and a preliminary injunction “enjoining Moultrie, or anyone acting on his behalf, from holding the meeting of the members and taking the actions set forth” in the notice of the special meeting and “enjoining any additional actions by Moul-trie to sell Autauga Automotive or its as *834 sets or to take any further actions that are detrimental to the best interest of Autauga Automotive, the dealership, or Wall.” The complaint also asked the circuit court to issue a judgment declaring, among other things, that Wall owns a 90% interest in the “profits and losses of Autauga Automotive, [ and that] Wall is the ‘majority in interest’ Member of Autauga Automotive with the right to make decisions as such under the operating agreement.” On December 2, 2011, the circuit court granted the plaintiffs’ request for a TRO. On December 14, 2012, by an agreement of the parties, the circuit court entered an order extending the December 2 TRO until further order of the court.
The following pertinent procedural history was set forth in Moultrie v. Wall, 143 So.3d 128, 182-33 (Ala.2013): ’
“On January 3, 2012, Moultrie filed an answer and a counterclaim. Moultrie alleged, among other things, that Wall had breached fiduciary duties he owed Autauga Automotive as its manager and that Wall had breached the operating agreement of Autauga Automotive. Moultrie also sought a preliminary injunction seeking, among other things, to prohibit Autauga Automotive from paying Wall anything except his monthly salary. Moultrie also moved the circuit court to dismiss any claim brought by Autauga Automotive. In his motion to dismiss, Moultrie alleged that, because Moultrie owned a 51% majority interest in Autauga Automotive, Wall lacked standing to bring suit on behalf of Au-tauga Automotive without Moultrie’s approval or consent.
“On February 13, 2012, Wall filed a petition seeking to hold Moultrie in contempt for violating the terms of the TRO.... Wall requested an award of costs for filing the motion and an award of damages to prevent further violations of the TRO.
“On February 21, 2012, the plaintiffs amended their complaint, adding a claim to enforce a ‘letter of intent’ signed by Moultrie and acknowledged by Wall in October 2011 indicating that Moultrie intended to sell his interest in Autauga Automotive.... On February 27, 2012, the circuit court entered an amended TRO, based on an agreement of the parties, that was to remain in effect pending further order of the court....
“On March 20, 2012, the day before the final hearing in this matter was scheduled to take place, all four attorneys representing Moultrie filed a motion for leave to withdraw from the case. The same day, Wall filed a second petition seeking to hold Moultrie in contempt for violating the TRO and the amended TRO.... The circuit court allowed Moultrie’s attorneys to withdraw and postponed the final hearing that had been scheduled for March 21.
“On May 1, 2012, Moultrie filed a motion seeking the return of funds of Autauga Automotive and a petition seeking to hold Wall in contempt....
“After conducting a hearing, the circuit court entered a judgment on May 29, 2012, finding Moultrie in contempt for violating the TRO and the amended TRO.... In a separate judgment entered on May 29, 2012, the circuit court ■denied Moultrie’s motions seeking the return of funds and his petitions seeking to hold Wall in contempt.
“On June 21, 2012, the circuit court entered a judgment assessing $132,345.57 in attorney fees and costs against Moultrie.”
Frakes testified that, at this point in the litigation, the dealership had been operating below Ford’s minimum capital requirement for months, and, in June 2012, there was a shortfall of approximately $180,000 in the working-capital requirement on Au- *835 tauga Automotive’s financial statement. Frakes and Wall had communicated with Ford about this issue, and they told Ford representatives that they did not want to infuse more cash into the dealership while litigation was pending. According to Frakes, Ford was giving them leeway about providing more capital for the dealership because it thought that the trial in this case was supposed to take place in March 2012 and because Wall had promised to capitalize the dealership once the litigation was over.
However, on July 19, 2012, Wall and Frakes received an e-mail from Autauga Automotive’s Ford credit representative that stated: “Do you know why [Autauga Automotive] shows a negative used equity on the May financial statement? Also, their Net Cash Requirement has increased to over $600,000. This is consistent with the trend from this time last year; however, they have zero internal resources to mitigate the amount.” Frakes and Wall took this message as a clear warning that Ford was about to make a “cash call.”[5] Frakes testified that Autauga Automotive needed the additional capital to appear on the July 2012 monthly financial report that he sent to Ford so there was not another report with a large deficit in working capital. Wall and Frakes were able to secure a $250,000 loan, and they received the funds on July 31, 2012. The loan proceeds were not put into an account owned by Autauga Automotive because Frakes and Wall did not want Moultrie to have access to the money; however, the money was in an account accessible to Autauga Automotive and was reported on Autauga Automotive’s July financial statement It is undisputed that no one told Moultrie about the e-mail from Ford that caused Wall and Frakes to borrow money to contribute additional capital to Autauga Automotive.
In August 2012, Moultrie appealed the circuit court’s May 2012 contempt judgment and the June 2012 attorney-fee judgment to -this Court. On September 10, 2012, while Moultrie’s appeal was pending in this Court, the circuit court conducted a bench trial on the plaintiffs’ request for a declaratory judgment and on Moultrie’s pending counterclaim. At that hearing, the plaintiffs introduced a document, which was undisputedly handwritten by Moultrie, that set forth the terms of the August 2009 agreement, quoted above. Although there were signature lines on the document for Moultrie, Wall, and Mariner, there were no signatures on the document submitted as evidence. Mariner testified that Wall, Moultrie, and Mariner had signed the August 2009 agreement. The plaintiffs presented evidence indicating that the signed copy of the August 2009 agreement was kept in Wall’s office at Gilmore Ford; that the August 2009 agreement, along with other company documents, had been stolen from Wall’s office while this litigation was pending; and that the signed copy .of the August 2009 agreement had not been recovered. Trial of the issues could not be *836 completed on that date, and the circuit court entered an order stating that the trial would resume on November 30, 2012.
On September 17, 2012, Wall sent Moul-trie a letter asking Moultrie, pursuant to paragraph V of the operating agreement, to contribute $93,718 in capital to Autauga Automotive in order to maintain his 51% ownership in the assets of Autauga Automotive.[6] Paragraph V states:
“The owners may contribute in proportionate amount any additional capital deemed necessary for the operation of [Autauga Automotive], provided, however, that in the event that any member deems it advisable to refuse or fails to contribute his share of any or all of the additional capital, then the other members or any one of them may contribute the additional capital not paid in by such refusing member and shall receive therefor[ ] an increase in the proportionate share of the ownership or interest in the entire company in direct proportion to the said additional capital contributed.”
Wall gave Moultrie 30 days to comply, but Moultrie did not respond to the letter or contribute any capital to Autauga Automotive. Wall sent Moultrie a second letter on October 23, 2012, asking that Moultrie contribute $93,718 in capital to Autauga Automotive by October 31, 2012, and informing him that, if he did not, the capital accounts would be rebalanced so as to divest Moul-trie of his membership interest.
On October 26, 2012, Moultrie filed a motion for a protective order regarding Wall’s request for an additional capital contribution. Moultrie argued that the capital call was improper while litigation concerning the controlling interest of Au-tauga Automotive was pending, that Wall owed money to Autauga Automotive and should not be able to demand a capital contribution from Moultrie, and that Wall failed to call a meeting of the members of Autauga Automotive or otherwise to discuss the cash call issue with' Moultrie before Wall decided a capital contribution by Moultrie was necessary. Wall responded to Moultrie’s motion on October 31, 2012, and asked the circuit court to “ratify the actions of [Autauga Automotive] in reba-lancing the capital accounts of the company in accordance with the provisions of its operating agreement.” The circuit court did not rule on Moultrie’s motion for a protective order on or before October 31, 2012, and Moultrie did not contribute any capital to Autauga Automotive. On October 31, 2012, Autauga Automotive’s capital accounts were rebalanced to reflect that Moultrie had no interest in the capital, profits, or losses of Autauga Automotive.
On November 11, 2012, Moultrie filed a motion to recuse, requesting that the circuit court judge who had presided over this case since its inception recuse himself from the proceedings based on an allegation that the judge, on September 12, 2012, had an improper ex parte communication with a witness who had testified at the September 10 trial. The circuit court denied the motion to recuse on November 19, 2012. On November 20, 2012, the plaintiffs moved for a partial summary judgment, arguing that Wall was entitled to a judgment as a matter of law declaring him the owner of 100% of the ownership or interest in Autauga Automotive in light of Moultrie’s failure to respond to the request for an additional capital contribution.
On November 26, 2012, Moultrie filed in this Court a petition for a writ of mandamus directing the circuit court judge presiding over this case to recuse himself. On *837 November 29, 2012, this Court granted Moultrie’s request for a stay of the proceedings pending disposition of the mandamus petition. On August 30, 2013, this Court denied Moultrie’s petition for a writ of mandamus without an opinion. See Ex parte Moultrie (No. 1120250, August 30, 2013), 170 So.3d 721 (Ala.2013) (table). On September 13, 2013, this Court released its decision in Moultrie’s appeal. See Moultrie v. Wall, 143 So.3d 128 (Ala.2013). We dismissed “Moultrie’s appeal insofar as it relate[d] to the May 29, 2012, contempt judgment or the February 27, 2012, TRO,” 143 So.3d at 136, and we affirmed “the judgment assessing attorney fees and costs.” 143 So.3d at 139.
On October 11, 2013, Moultrie filed a motion requesting permission from the court to depose Wall, even though one day of trial had been completed, because, he said, “new issues” had arisen; specifically, Moultrie stated that he needed to depose Wall concerning Wall’s September 2012 request for additional capital from Moul-trie. On November 8, 2013, the circuit court denied the plaintiffs’ motion for a partial summary judgment because the motion was filed “in the middle of trial.” On the same day, the circuit court denied Moultrie’s request to depose Wall. The circuit court subsequently set a final hearing date of March 10, 2014.
On March 6, 2014, the plaintiffs filed a motion to strike Moultrie’s expert disclosures as untimely. The plaintiffs argued that the circuit court had set an October 31, 2012, deadline for disclosing expert witnesses and that Moultrie should not be permitted to present the testimony of experts who had not been disclosed by that date. At the start of the hearing on March 10, 2014, the circuit court stated that Moultrie’s motion for a protective order, which concerned Wall’s September 2012 request for a capital contribution, was still pending. Counsel for Moultrie stated that the expert Moultrie proposed to call was necessary only if the court was going to allow testimony related to Wall’s re- . quest for additional capital. The circuit court granted the plaintiffs’ motion to strike and stated that any expert disclosed after October 31, 2012, would not be permitted to testify.
Frakes testified at the March 10 hearing that he had not considered that Wall could request that Moultrie contribute 51% of • the capital needed by Autauga Automotive in July 2012 until Moultrie’s counsel asked him that question on the first day of trial on September 10, 2012. Although Frakes had testified at the September 10 hearing about the $250,000 capital contribution that took place after he and Wall heard “things” from Ford “that made us worry [Ford was] going to make a cash call,” Frakes testified in more detail about the cash-call issue at the March 10 hearing. The e-mail from Ford dated July 19, 2012, that convinced Wall and Frakes that Ford was about to make a cash call was introduced into evidence; Moultrie objected because, he said, he had never seen the email and did not know of its existence until the last day of trial. When the plaintiffs offered the September 17, 2012, eapital-contribution-request letter from Wall to Moultrie into evidence, the circuit court granted Moultrie a continuing objection to any testimony or documents related to the cash call that took place after the first day of trial on September 10, 2012. Frakes admitted that paragraph VIII of the operating agreement provided for a meeting among members to discuss decisions related to Autauga Automotive, such as the cash call, and that Wall had not conducted a meeting with Moultrie before requesting a capital contribution from Moultrie. Wall testified that he did not call a meeting with Moultrie before securing additional capital for Autauga Automotive because he was *838 “interested in saving [his] back side” at the time.
At the conclusion of the plaintiffs’ case, the plaintiffs moved to “amend their complaint to conform to the evidence” presented at trial, specifically: that the July 31, 2012, capital contribution was necessary to satisfy Ford, that the request for a capital contribution from Moultrie was made in compliance with paragraph V of the operating agreement, that the time for Moul-trie to respond to the capital call was reasonable, that Moultrie failed to respond, and that, as of October 31, 2012, due to Moultrie’s failure to respond, Wall became the sole owner of Autauga Automotive. Moultrie objected and argued that the motion to amend was not timely and that the plaintiffs had not demonstrated that an additional capital contribution was needed — only that Wall and Frakes feared that one was needed. The circuit court granted the plaintiffs’ motion to amend their pleadings, over Moultrie’s objection.
On March 11, 2014, the circuit court entered a final judgment on all pending claims before the court. The circuit court found that a signed copy of the August 2009 agreement had been stolen from Wall’s office, that the August 2009 agreement provided that Moultrie “was to retain a 10% interest in the business and participate in any profits distribution as a 10% owner,” that the August 2009 agreement modified paragraph VII of the operating agreement, and that the K-l schedules prepared in 2009 and 2010 and “other evidence support Wall’s contention and the court’s finding that Wall had a 90% interest in the profits and losses and Moultrie had a 10% interest in the profits of [Autau-ga Automotive].”
The circuit court also made specific findings of fact about the “cash-call” issue. The court noted that the evidence demonstrated that Moultrie had never contributed any capital to Autauga Automotive; that Moultrie, in May 2012, had expressed concern about Autauga Automotive’s working capital falling below Ford’s guidelines; and that Moultrie was aware of the possibility of a cash call by Ford as early as July 2011. The court stated:
“Since Wall, pursuant to the ‘side agreement’ of August 2009, possesses a 90% interest in profits and losses he made the decision to make a ‘cash call’ on Moultrie pursuant to paragraph V of the operating agreement.[7] Wall did not call a meeting as required by paragraph VIII as this emergency occurred during the pendency of this litigation and would have been fruitless. Clearly, his majority interest of 90% and position as Manager of [Autauga Automotive] give him the right to make such a decision.”
The circuit court determined that, because Moultrie did not make the capital contribution to Autauga Automotive requested by Wall, “Wall is the 100% owner in capital and in profits and losses of Au-tauga Automotive.” The circuit court entered a separate order denying as moot Moultrie’s motion for a protective order, stating that “the cash call was an emergency that was necessary and should have been complied with by [Moultrie] in accordance with [Autauga Automotive]’s operating agreement.” Moultrie filed a post-judgment motion pursuant to Rule 59, Ala. R. Civ. P. The circuit court denied that motion, and Moultrie timely appealed to this Court.
*839 On appeal, Moultrie challenges the circuit court’s determination that Wall owned 90% and Moultrie owned 10% of the profits and losses of Autauga Automotive and that Moultrie was divested of his 10% interest on October 31, 2012, when he failed to contribute capital to Autauga Automotive. Moultrie also contends that Autauga Automotive was not a proper party to an action between two of its members to determine the members’ respective ownership interests.

II. Standard of Review

“Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies.” Kennedy v. Boles Invs., Inc., 53 So.3d 60, 67 (Ala.2010).
“ ‘ “ ‘[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.”” Water Works & Sanitary Sewer Bd. v. Parks, 977 So.2d 440, 443 (Ala.2007) (quoting Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005), quoting in turn Philpot v. State, 843 So.2d 122, 125 (Ala.2002)). ‘ “The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Wattman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Wattman v. Rowell, 913 So.2d at 1086.” Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007). “Questions of law are reviewed de novo.” Alabama Republican Party v. McGinley, 893 So.2d 337, 342 (Ala.2004).

III. Analysis

A. Ownership of Profits and Losses of Autauga Automotive

Moultrie first challenges the circuit court’s conclusion that Wall had a 90% interest and Moultrie a 10% interest in the profits and losses of Autauga Automotive. Moultrie first argues that the circuit court’s conclusion that Autauga Automotive’s operating agreement was amended so that Moultrie had only a 10% interest in the profits and losses unlawfully conflicts with the allocation of profits and losses set forth in Autauga Automotive’s articles of organization, as admitted by ’the plaintiffs in their pleadings. Section 10A-5-4.03(a), Ala.Code 1975, which concerns operating agreements, provides, in pertinent part: “An operating agreement may contain any provisions regarding the affairs of a limited liability company and conduct of its business that are not inconsistent with the laws of this state or the articles of organization.”[8] The plaintiffs stated in their verified complaint, and Moultrie admitted in his answer, that Autauga Automotive’s articles of organization conferred on Moul-trie a 51% interest in the capital and the profits and losses of Autauga Automotive. Thus, Moultrie contends, the circuit court acted contrary to § 10A-5-4.03(a) by concluding that the August 2009 agreement— by designating Wall as having a 90% interest in the- profits and losses and Moultrie as having a 10% interest — amended Autau- *840 ga Automotive’s operating agreement in such a manner that the operating agreement became inconsistent with the allocation of profits and losses in Autauga Automotive’s articles of organization.
The plaintiffs argue that Moultrie did not make this argument below and, therefore, that it cannot be a basis for reversing the circuit court’s judgment. See Birmingham Hockey Club, Inc. v. National Council on Comp. Ins., Inc., 827 So.2d 73, 80 (Ala.2002) (“In order to be considered on appeal, issues must be presented to the trial court and to the opposing parties at the trial level.”). In his reply brief, Moultrie contends that he raised this issue in a motion for a summary judgment filed in August 2012. In that motion, Moultrie directed the circuit court’s attention to the fact that the plaintiffs admitted in their pleadings that the July 20, 2009, amendment to the articles of organization and the operating agreement conferred on Moultrie a 51% ownership interest in the capital, profits, and losses of Autauga Automotive. He then argued that “no parol evidence should be admissible in this matter as the company’s governing documents are unambiguous, and any parol evidence would be in direct contradiction to these governing documents.” However, Moultrie did not argue that the August 2009 agreement could not have amended the operating agreement on the basis that the terms of the operating agreement concerning the allocation of profits conflicted with the allocation of profits in the articles of organization, contrary to the requirements of what was then § 10A-5-4.03(a). In fact, Moultrie did not mention the August 2009 agreement at all in his motion for a summary judgment.
Moultrie contends that the above-quoted argument he made in his summary-judgment motion is essentially a broad allegation that any evidence of a 90/10 split in profits and losses contradicts, or is “inconsistent with,” the “governing documents” of Autauga Automotive. However, considering the argument in Moultrie’s motion for a summary judgment as a whole — an argument entirely focused on whether parol evidence should be considered to support Wall’s allegation that the parties’ actual agreement was different from the unambiguous terms of Autauga Automotive’s “governing documents” as amended in July 2009 — it is clear that Moultrie did not' preserve the argument he presents in this part of his appeal for appellate review. This Court has long held that it “will not hold a trial court to be in error unless that court has been apprised of its alleged error and has been given the opportunity to act thereon.” Sea Calm Shipping Co. v. Cooks, 565 So.2d 212, 216 (Ala.1990) (citing Defore v. Bourjois, Inc., 268 Ala. 228, 105 So.2d 846 (1958)). This is so, in part, because “ ‘ “there is something unseemly about telling a lower court it was wrong when it never was presented with the opportunity to be right.””’ Ex parte Elba Gen. Hosp. & Nursing Home, Inc., 828 So.2d 308, 314 (Ala.2001) (quoting Cantu v. State, 660 So.2d 1026, 1031-32 (Ala.1995) (Maddox, J., concurring in part and dissenting in part), quoting in turn State v. Applegate, 39 Or.App. 17, 21, 591 P.2d 371, 373 (1979) (emphasis omitted)). We note that Moultrie identifies this alleged error on appeal as the means of the “simplest disposition of this case.” Moultrie’s brief, at 44. Yet this admittedly straightforward argument was never presented to the circuit court in Moultrie’s motion for a summary judgment or, notably, in his postjudgment motion. Because Moultrie failed to “present[ ] this argument to the trial court and opposing parties so as to give them an opportunity to address this issue,” we will not consider on appeal this argument as a basis for *841 reversal. Birmingham Hockey Club, 827 So.2d at 81.
Moultrie next argues that the circuit court relied on legally insufficient evidence to find that the parties amended Autauga Automotive’s operating agreement after the July 2009 amendment. Pursuant to what was then § 10A-5-4.03(b), Ala.Code 1975, “[i]f an operating agreement does not provide for the method by which an operating agreement may be amended, then all of the members shall agree in writing to any amendment.” It is undisputed that the operating agreement does not provide a method by which that agreement may be amended; therefore, any amendment to the operating agreement must be in writing and agreed to by both Wall and Moultrie. Moultrie argues that the evidence the circuit court relied on to determine that the parties had agreed to amend the operating agreement after July 2009 — such as the August 2009 agreement, Moultrie’s acceptance of only 10% profits during the 2009 tax-planning meeting,- and Jones’s preparation of the tax documents — was insufficient to show that Moultrie and Wall “agree[d] in writing” to such an amendment.
In support of his position, Moultrie relies on this Court’s decision in L.B. Whitfield Family Trust, LLC v. Whitfield, 150 So.3d 171 (Ala.2014). In Whitfield, we considered whether the trial court properly ordered the L.B. Whitfield, III Family LLC (“the Family LLC”) “to wind up its affairs following its dissolution on the death of its sole member,” L.B. Whitfield. 150 So.3d at 174. After L.B.’s death, the executor of his estate “took several steps ... that the Family LLC contends were part of an effort to continue the Family LLC in the wake of L.B.’s death,” 150 So.3d at 176, including “obtaining an employer-identification number necessary for a multimember limited-liability company; ... opening a bank account for the dividends received on the shares of Whitfield Foods held by the Family LLC; and ... working with accountants to establish capital accounts” for each of L.B.’s heirs. Id. After L.B.’s estate was closed, litigation between the Family LLC and some of L.B.’s heirs commenced. Some the heirs asked the trial court to enter an order requiring the Family LLC to wind up its affairs because, they contended, the Family LLC was dissolved at the time of L.B.’s death. Section § 10A-5-7.01(3)a., Ala. Code 1975, provided that an LLC is “dissolved and its affairs shall be wound up ... [w]hen there is no remaining member, unless ... [t]he holders of all the financial rights in the limited liability company agree in writing ... to continue the legal existence and business of the limited liability company.”[9] The Family LLC argued that the actions of L.B.’s executor to continue the existence of the Family LLC after L.B.’s death, as well as L.B.’s heirs’ consent to the final settlement of L.B.’s estate, constituted an “agreement in writing” to the continuation of the Family LLC. This Court held that, pursuant to the plain terms of § 10A-5-7.01(3)a., the agreement to continue the legal existence of the Family LLC had to be in writing and that the legal existence of the Family LLC could not be continued by implication based on the actions of the heirs or of L.B.’s executor.
Moultrie contends that this Court’s strict application of the phrase “agree in writing” in § 10A-5-7.01(3)a. should also be applied to the phrase “agree in writing” found in § 10A-5-4.03(b), that is, that the circuit court could not rely on Moultrie’s *842 2009 oral agreement to accept only 10% of the profits, Jones’s preparation of tax documents that allocated to Moultrie only 10% of the profits, or the “unsigned” August 2009 agreement to support a conclusion that Wall and Moultrie had “agreed in writing” to amend the operating agreement. We agree that Moultrie’s oral agreement to accept 10% of the profits of Autauga Automotive at the December 2009 tax-planning meeting and Jones’s preparation of tax documents reflecting that agreement, alone, would be insufficient to meet the requirement of § 10A-5-4.03(b) that an amendment to Autauga Automotive’s operating agreement' be in writing. However, the glaring difference between the facts in the present case and the facts in Whitfield is that the plaintiffs in the present case presented evidence indicating that there was an agreement in writing signed by both Moultrie and Wall, specifically the August 2009 agreement, that amended the operating agreement. Moul-trie takes issue with the fact that the copy of the August 2009 agreement that was submitted into evidence was unsigned, but it was undisputed that a signed copy of the August 2009 agreement was kept in Wall’s office and that that copy was stolen from Wall’s office while this litigation was pending.[10]
Moultrie contends that testimony establishing that the August 2009 agreement was signed is insufficient to justify the circuit court’s conclusion that Moultrie’s interest in the profits and losses of Autau-ga Automotive was only 10%. In this regard, he first contends that the August 2009 agreement does not purport to modify the allocation of profits and losses reflected in the July 2009 articles' of organization and admitted in the pleadings. He contends that, because there was no evidence indicating that the August 2009 agreement had been filed in the Autauga Probate Court pursuant to what was then § 10A-5-2.03 and -2.04, Ala.Code 1975, there is insufficient evidence to give the August 2009 agreement “operative effect.” Section 10A-5-2.03 required an amendment to the certificate of formation, formerly known as the articles of organization,[11] to be delivered “to the judge of probate in whose office the certificate of formation is filed.” Section 10A-5-2.04 specified how “each instrument required by this chapter to be filed in the office of the judge of probate shall be executed.” Neither § 10A-5-2.03 nor -2.04 required that an amendment to the operating agreement be filed with the probate court. To the extent that Moultrie is arguing, as he did above, that an amendment to the articles of organization was necessary and should have been filed in the Autauga Probate Court before the August 2009 agreement could be construed as amending the operating agreement, as we concluded above, Moultrie did not preserve that argument for appellate review.
Moultrie also contends that “the terms of the document are far from clear about whether it was intended to be an amendment to the operating agreement.” Moul-trie’s brief, at 53. To support this contention, Moultrie points only to the fact that *843 the heading of the August 2009 agreement states “Agreement for Purchase of Gilmore Ford Assets & Franchise by Autau-ga Automotive.” Moultrie cites no authority to support his argument that, because the August 2009 agreement does not use the word “amendment” or specifically refer to the operating agreement, it cannot be a valid amendment to the operating agreement, even though it specifically provides that Moultrie will participate “with any and all profit distributions as 10% owner of Autauga Automotive.”
Moultrie further contends that “the evidence is not clear and convincing, as it should be, to resolve such a central issue controlled by statutes requiring the parties to ‘agree in writing.’ ” Moultrie’s brief, at 53. Citing Bradley v. Nall, 505 So.2d 1062 (Ala.1987), Moultrie contends that “[t]his Court has required more evidence to establish an agreement in writing by proof as to a lost writing.” Moultrie’s brief, at 53. In Bradley, this Court considered “whether the trial court erred in admitting secondary evidence of an allegedly lost or destroyed legal document,” specifically, an “unrestricted guaranty” on a promissory note. 505 So.2d at 1063. At trial, there was disputed evidence about whether Bradley had signed an unrestricted guaranty as Nall alleged, and the trial court allowed an unsigned copy of the unrestricted guaranty as a substitute for a lost or destroyed original. We stated:
“In order to admit evidence of a lost document, the proponent must establish: (1) the existence and execution of the document; (2) the substance of its contents; and (3) the loss or destruction of the document or other satisfactory reason for failure to produce the original. Wiggins v. Stapleton Baptist Church, 282 Ala. 255, 210 So.2d 814 (1968).
[[Image here]]
“In establishing the existence of an executed document, we think the evidence must be clear and convincing. Wiggins, supra. This is especially true where the party seeking to hold others liable on the instrument is responsible for its loss.”
505 So.2d at 1064.
In Bradley, we held that there was not clear and convincing evidence to support the existence of an unrestricted guaranty signed by Bradley, which had been lost. We considered that Nall testified that Bradley had signed the unrestricted guaranty, that Nall’s attorney testified that he could not swear that Bradley had signed the unrestricted guaranty, and that Bradley denied that he had signed the unrestricted guaranty. We stated that the Statute of Frauds, which required a signed writing by Bradley under the circumstances of that case, “was enacted to prevent this very kind of swearing match.” 505 So.2d at 1064.
Moultrie contends that there was not clear and convincing evidence of the existence and execution of the August 2009 agreement and that, like the Statute of Frauds, the requirement in § 10A-5-4.03(b) that an amendment to an operating agreement be in writing was meant to “block reliance on parol evidence ... to change an operating agreement.” Moul-trie’s brief, at 53. However, we conclude that the plaintiffs presented clear and convincing evidence of the existence and execution of the August 2009 agreement, the substance of its contents, and its loss. As we stated above, Moultrie did not dispute the evidence presented by the plaintiffs regarding the August 2009 agreement. There was no “swearing match” between Wall, Mariner, and Moultrie; instead, all evidence presented to the circuit court supported the circuit court’s conclusion that a signed copy of the August 2009 agreement existed and had been kept in Wall’s office until it was stolen. Accord *844 ingly, we cannot conclude that the circuit court erred by determining that the August 2009 agreement existed and was executed by both Wall and Moultrie.
Based on the arguments presented on appeal that were properly preserved for our review, we cannot conclude that the circuit court erred by holding that the August 2009 agreement amended the operating agreement so as to give Moultrie a 10% interest in the profits and losses of Autauga Automotive. Accordingly, that part of the circuit court’s judgment is due to be affirmed.

B. Moultrie’s Interest in Autauga Automotive after Wall’s September 2012 Request for Additional Capital

Moultrie next challenges the circuit court’s conclusion that he was divested of his membership interest in Autauga Automotive. In this regard, Moultrie first argues that the plaintiffs’ pleadings were not amended as required by the Alabama Rules of Civil Procedure so as to allow the circuit court to consider the “capital-call issue,” i.e., Moultrie’s failure to comply with Wall’s demand for a capital contribution pursuant to paragraph V of the operating agreement. Specifically, Moultrie argues that, because the plaintiffs did not file a pleading raising the capital-call issue, the “circuit court was without jurisdiction to issue a judgment that Moultrie had not complied with paragraph V.” Moultrie’s brief, at 56. Moultrie contends that Rule 15(b), Ala. R. Civ. P., which allows a pleading to be amended to conform to the evidence, does not excuse the plaintiffs from filing a pleading to amend their complaint.
Although Moultrie objected to the plaintiffs’ motion to amend the pleadings to conform to the evidence made at trial on March 10, 2014, Moultrie never argued, at any point during the proceedings below, that the circuit court did not have authority to consider any amendment if the plaintiffs did not actually file a pleading amending their complaint in the circuit court. As set forth extensively above, this Court will not reverse the circuit court’s judgment based on an argument Moultrie never presented to the court for its consideration. See Birmingham Hockey Club, supra. Although Moultrie frames this issue as a “jurisdictional” one, it does not concern the circuit court’s subject-matter jurisdiction. See Russell v. State, 51 So.3d 1026, 1028 (Ala.2010) (“In determining a court’s subject-matter jurisdiction, ‘we ask only whether the trial court had the constitutional and statutory authority’ to hear the case.” (quoting Ex parte Seymour, 946 So.2d 536, 538 (Ala.2006))). None of the authority cited by Moultrie supports his contention that the absence of a filed pleading amending the complaint deprives a circuit court of subject-matter jurisdiction to consider a claim under the circumstances of this case. Whether the plaintiffs should have filed an amendment to their pleadings after the circuit court granted the plaintiffs’ > oral motion to amend their pleadings on the last day of trial has no bearing on the circuit court’s constitutional or statutory authority to consider that claim. Accordingly, because this argument was raised for the first time on appeal and does not concern the circuit court’s subject-matter jurisdiction to consider the claim, we will not consider it further.
In a footnote on page 59 of his brief, Moultrie states that he “suffer[ed] prejudice from any ruling which would deem the pleadings amended.” He cites three cases, without a discussion of any of them, to support his contention. See, e.g., Advantage Sales of Alabama v. Clemons, 979 So.2d 114 (Ala.Civ.App.2007) (discussing Rule 15(b), Ala. R. Civ. P., and concluding that the trial court exceeded its discretion in allowing the plaintiff to present evidence of her depression to support her claim for damages because the claim *845 for damages based on depression was not included in her complaint, the plaintiff denied that she was seeking damages for depression during her deposition, and the defendant demonstrated that it would be prejudiced by the amendment).
In support of his contention that he “sufferfed] prejudice from any ruling which would deem the pleadings amended,” Moultrie states that the circuit court denied him the opportunity to depose Wall on the subject of the capital call, that the circuit court allowed the plaintiffs to present evidence regarding the capital call— including the July 19, 2012, e-mail from Ford to Wall that was not produced by the plaintiffs until March 10, 2014 — over his objections at the March 10 trial, and that the circuit court relied on that evidence to conclude that he had been divested of his interest in Autauga Automotive. These arguments do not demonstrate that Moultrie was prejudiced by the circuit court’s allowance of the amendment to the plaintiffs’ complaint but, instead, assert that Moultrie was prevented from presenting a defense to that claim by the circuit court’s discovery and evidentiary rulings concerning the capital-call issue. The capital-call issue was initially placed before the circuit court' by Moultrie in his motion for a, protective order, which was filed in October 2012, approximately 16 months before the March 10 trial. In response to that motion, Wall asked the circuit court to “ratify” the rebalancing of Autauga Automotive’s capital accounts to reflect that Moultrie had no interest in Autauga Automotive. Moultrie cannot possibly contend, and he does not, that he was surprised or otherwise caught off guard by the fact that evidence concerning the capital-call issue was presented to the circuit court at the March 10 trial. In fact, the record demonstrates that Moultrie had obtained an expert who was prepared to testify at the March 10 trial as to the necessity of the capital call.
Accordingly, we cannot conclude that Moultrie has demonstrated that he was prejudiced by the circuit court’s allowance of the amendment to the complaint concerning that capital call. Furthermore, Moultrie does not cite any authority or otherwise attempt to argue that the circuit court exceeded its discretion by refusing to allow Moultrie to depose Wall a third time or that the circuit court exceeded its discretion by sustaining Moultrie’s objection to admission of the July 19, 2012, e-mail, which was based primarily on the fact that the e-mail was “not produced in accordance with [the circuit court’s] orders.” See generally Ex parte Wal-Mart, Inc., 809 So.2d 818, 822 (Ala.2001) (“‘A trial court has very broad discretion in discovery matters, and its ruling on discovery matters will not be reversed absent a clear abuse of discretion.’” (quoting Ex parte Wal-Mart Stores, Inc., 682 So.2d 65, 67 (Ala.1996))); and Sweeney v. Purvis, 665 So.2d 926, 933 (Ala.1995) (“A trial judge has great discretion in ruling on the admissibility of particular evidence, and the judge’s ruling in that regard will not be disturbed on appeal except for an abuse of that discretion.”). Based on the arguments presented on appeal, we cannot conclude that Moultrie has demonstrated that the circuit court erred in considering the capital-call issue.
Next, Moultrie argues that even if the capital-call issue was properly considered by the circuit court, the circuit court erred in concluding that Moultrie had been divested of his interest in Autauga Automotive. In this regard, Moultrie first contends that the circuit court cannot excuse Wall from calling a meeting to discuss the capital-call issue with Moultrie, which the circuit found to be required by the operating agreement, “by labeling the event as an emergency and saying it ‘would have been fruitless.’” • Moultrie’s brief, at 61.
*846 This Court has held that “[o]perating agreements of limited liability companies serve as contracts that set forth the rights, duties, and relationships of the parties to the agreement.” Harbison v. Strickland, 900 So.2d 385, 391 (Ala.2004). Paragraph VIII of the operating agreement, which is labeled “Rights and Duties of the Parties,” provides that “[c]ompany decisions and actions shall be decided by a majority in interest of the members, at [a] meeting regularly called with notice to all members.” (Emphasis added.) Although the circuit court found that paragraph VIII required Wall to call a meeting before he made the capital call to Moultrie, Wall argues that paragraph VIII did not require a meeting between him and Moultrie before the capital call because paragraph V of the operating agreement, which controls Wall’s request for additional capital from Moultrie, does not specifically require a meeting. We disagree. Paragraph VIII is a general provision that sets forth, among other things, each member’s right to a' meeting before “company decisions and actions” are decided. Wall contends that the decision “to contribute capital is not a ‘company decision or action,’ but rather one left to the individual members of the company.” Wall’s brief, at 46. Although nothing in the operating agreement forbids an individual member from contributing additional capital to Autauga Automotive if that individual member desires to do so, we conclude that a decision that the company needs a substantial capital contribution and that all members will be required to provide a percentage of that contribution in order to maintain then-ownership interest in the company is a “company decision or action” that required a meeting of all members of Autauga Automotive before approval or implementation.
We agree with Moultrie that the urgency of the situation in July 2012 did not excuse the meeting. Wall argues that he did not have time to call a formal meeting with Moultrie in July 2012 because, after he received the e-mail from Ford on July 19, he and Frakes were frantically trying to obtain a loan to cover the shortfall in meeting Ford’s working-capital guidelines. We note, however, that the operating agreement does not require a “formal” meeting, and Wall did not demonstrate that in the 12 days between July 19 and July 31 he did not have even a few minutes to schedule an informal meeting, perhaps even a conference telephone call, to discuss the capital-contribution issue with Moul-trie. As noted above, it was undisputed that Wall had failed to mention the July 19 e-mail — the e-mail that allegedly spurred him and Frakes into action — to Moultrie until the last day of trial, nearly two years after he received the e-mail. Further, Wall presented no evidence indicating that, once the capital contribution was made on July 31 with the proceeds of the loan secured by Wall and Frakes, there was any “urgency” to his request for Moultrie to contribute his proportionate share of the capital so that a meeting could not be called and held.
Similarly, we cannot conclude that any perceived notion that such a meeting would have been “fruitless” excused the requirement of a meeting between Wall and Moultrie. Wall testified that he did not think he and Moultrie “would have had a very good meeting” about the capital contribution. The contentious nature of this case is certainly not lost on this .Court. Regardless, the likelihood of a hostile exchange between members cannot excuse the requirement in the operating agreement for a meeting of “all members” before such a decision is made by the majority in interest. We also cannot conclude that such a meeting would have been fruitless simply because Wall owned the majority interest in the company. Pursuant to the operating agreement, all mem *847 bers had a right to a meeting before company decisions and actions were decided by “a majority in interest of the members.” Finally, we cannot conclude that anything in the operating agreement allowed Wall, as the manager of Autauga Automotive, to make a unilateral demand for a capital contribution from Moultrie without otherwise complying with the requirement in the operating agreement that a meeting of all members be held before such a decision was made.
It is undisputed that Wall and Moultrie did not meet before Wall unilaterally decided to contribute additional capital to Autauga Automotive and to make a capital call on Moultrie after doing so. Because the terms of the operating agreement required' such a meeting and because Wall failed to comply with the terms of the operating agreement in this regard, the circuit court’s judgment is reversed insofar as it held that Moultrie was divested of his 10% interest in Autauga Automotive by failing to contribute additional capital pursuant to Wall’s September 2012 capital call, and the cause is remanded with directions to the circuit court to enter a judgment in favor of Moultrie on the claim that Moultrie was divested of his interest in Autauga Automotive.

C. Whether Autauga Automotive was a Proper Party

Moultrie finally argues that Au-tauga Automotive is barred by then § 10A-5-2.07, Ala.Code 1975, from suing Moultrie and that, therefore, “[t]he judgment against Moultrie in favor of Autauga Automotive should not stand.” Moultrie’s brief, at 67. The plaintiffs contend that this issue was not preserved for appellate review and that it “is not determinative of either [Wall’s or Moultrie’s] rights as it relates to this lawsuit.” Plaintiffs’ brief, at 48.
Although Moultrie argued, at several stages of the proceedings below (including in his postjudgment motion), that Wall, as the “minority shareholder” of Autauga Automotive, lacked “standing” to bring a lawsuit on behalf of Autauga Automotive, he did not argue that Autauga Automotive was barred by statute, or any other applicable law, from participating in an action against one of its members. Thus, neither the circuit court nor Wall had the opportunity to address or correct the error Moul-trie alleges on appeal. See Birmingham Hockey Club, 827 So.2d at 81. Accordingly, we will not consider this claim of error;

TV. Conclusion

The circuit court’s judgment, insofar as it concluded that Wall had a 90% interest in the profits and losses of Autauga Automotive and that Moultrie had a 10% interest in the profits and losses, is affirmed. However, that part of the circuit court’s judgment holding that Moultrie was divested of his interest in Autauga Automotive by failing to make a capital contribution pursuant to Wall’s September 2012 capital call is reversed, and the cause is remanded to the circuit court with instructions to enter a judgment in favor of Moul-trie on that claim. The plaintiffs request an award of attorney fees “for responding to [Moultrie’s] frivolous appeal.” Plaintiffs’ brief, at 49-50. That request is denied.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
MOORE, C.J., and STUART, PARKER, SHAW, and WISE, JJ., concur.
MURDOCK and MAIN, JJ., concur in the result.
BOLIN, J., recuses himself.

. This is the third time these parties have appeared before this Court. See Moultrie v. Wall, 143 So.3d 128 (Ala.2013), and Ex parte Moultrie (No. 1120250, August 30, 2013), 170 So.3d 721 (Ala.2013) (table).

. The application indicated that the agreement to divide the interests in Autauga Automotive 45%, 45%, and 10% was discussed among the parties as early as June 12, 2009, before Wall and Mariner filed articles of organization for Autauga Automotive.

. , The record indicates that the amended articles of organization were filed in the Autauga , Probate Court on August 19, 2009.

. In a 2009 capital-account summary, Moul-trie was credited for that capital contribution, but, a year later, Autauga Automotive’s accountant discovered that Moultrie had not made a capital contribution and a “reclassification entry” was made in the capital-account summary.

. Frakes explained a "cash call” as follows:
"A cash call is when either the manufacturer or your captive lending arm and floor plan provider comes to you and says you have to put money into the store to retain either your franchise or your floor plan. Now, the fear of the cash call is they won’t come in and ask for a little bit of money, they will come in and they’ll ask to plug the big hole that’s in the financial....
"So if they come in and they ask for that and we, as a company, cannot produce that money, they have the right to perform several actions. They can suspend our floor plan and claim our titles, which is detrimental to the business. They can go a step further than that and require that our floor plan be satisfied, be completely paid off, which would shut the doors totally. Or if it was the manufacturer that came to you, they can pull the franchise. So none of those options are good options.”

. Frakes testified that $93,718 represented 51% of the amount required to bring the dealership to a zero deficit in working capital in July 2012, not 51% of the amount contributed by Wall (and Frakes) in July 2012.

7. The circuit court and, at times, the parties, use the term "cash call” to refer to the “cash call” Wall and Frakes feared would occur if Autauga Automotive's July 2012 financial statement did not meet Ford’s working-capital requirement, as well as Wall's request for additional capital from Moultrie.

. In 2014, the legislature enacted the Alabama Limited Liability Company Law of 2014, effective January 1, 2015. Act No. 2014-144, Ala. Acts 2014. Act No. 2014-144 updated Alabama’s limited-liability-company law, repealed existing law in Chapter 5 of Title 10, and replaced Chapter 5 of Title 10 with Chapter 5A.

. The "Events of dissolution” are now codified at § 10A-5A-7.01, Ala.Code 1975; however, the internal numbering and some language of that section were changed in the 2014 revision. See supra note 8.

. In its final judgment, the circuit court found that "Moultrie denies the existence or execution of” the August 2009 agreement. However, neither Moultrie nor any witness on his behalf testified at either the September 10, 2012, or the March 10, 2014, hearing that the August 2009 agreement did not exist or that it had not been signed by Mariner, Wall, and Moultrie.

. See Comment to then § 10A-5-2.01, Ala. Code 1975 ("[Tjhis chapter sometimes uses the generic term ‘certificate of formation’ as an alternative to ‘articles of organization,’ the traditional term used for the certificate of formation of [limited liability companies].”).