Rel: February 27, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

## SC-2025-0500

_____

**Dr. Tracy Smitherman, in her official capacity as Superintendent of the Alabama Department of Youth Services School District; and Robert Duke, Crissy Griffin, Gayla Caddell, and William McDowell, in their official capacities as members of the Alabama Department of Youth Services School District Education Committee**

**v.**

**Derrick Roberts**

**Appeal from Montgomery Circuit Court**
**(CV-23-227)**

SC-2025-0500

SHAW, Justice.

Dr. Tracy Smitherman, in her official capacity as Superintendent of the Alabama Department of Youth Services School District ("DYS"), and Robert Duke, Crissy Griffin, Gayla Caddell, and William McDowell, in their official capacities as members of the DYS Education Committee (referred to collectively as "the DYS defendants"), appeal from the Montgomery Circuit Court's judgment in favor of Derrick Roberts, a teacher formerly employed by DYS and the plaintiff in this employment dispute. We reverse and remand.

### Facts and Procedural History

In September 2019, Roberts, then a tenured teacher employed by the Montgomery County public-school system, applied for and accepted a probationary teaching position with DYS, which provides education to the juvenile offenders in state custody. See Ex parte Alabama Dep't of Youth Servs., 401 So. 3d 276 (Ala. 2024) ("Ex parte DYS"). According to Roberts, he was hired by DYS effective September 17, 2019, when he

2

received the following email message from Dr. Smitherman,[1] stating, in pertinent part:

> "I am so excited about you joining our team. You will be expected to report to the Washington Hall -- DYS Central Office located at 1000 Industrial School Road on October 7, 2019[,] at 8 am. You will participate in training for the first couple of weeks before you report [to] the L.B. Wallace School. I need for you to contact your previous employers and request verification of experience and accumulated leave documentation and have it mailed to me. This information will be used to ensure we credit your experience and make sure your salary reflects such."

The following day, in response to a follow-up inquiry from Roberts asking "when ... [he] need[ed] to come sign a contract," Dr. Smitherman further replied via email as follows: "We don't sign contracts at DYS. <u>Your contract will run from 10/7/19 to 8/28/20</u>." (Emphasis added.)

By letter dated September 19, 2019, Roberts officially resigned from his position with the Montgomery County public-school system; his last day of employment there was September 27, 2019. Thereafter, on October 7, 2019, Roberts, as directed, attended the referenced mandatory

---

[1]As of the message date, Dr. Smitherman served as the "federal programs coordinator" for DYS; she was later named its superintendent.

training session; that training session was conducted from October 7, 2019, through October 25, 2019.[2]

Thereafter, Roberts continued his position with DYS but, in April 2023, received written notice from the DYS defendants indicating that his employment as a teacher with DYS was not being renewed.[3] As a result, a dispute arose between DYS and Roberts as to the date Roberts began his employment with DYS and whether he had, under the Students First Act of 2011 ("the Act"), § 16-24C-1 et seq., Ala. Code 1975, been employed long enough to have attained tenure -- an occurrence that would have entitled Roberts to certain due-process protections before dismissal. Ex parte DYS, 401 So. 3d at 279-80. See generally §§ 16-24C-5 and 16-24C-6, Ala. Code 1975. Specifically, if Roberts's effective date of employment occurred before October 1, 2019, then, under the Act,

_____

[2]The record suggests that DYS policy requires that all new employees receive training -- consisting of a three-week orientation session -- before having direct contact with the juvenile offenders housed in a DYS facility.

[3]Roberts's last day of actual work with DYS following the nonrenewal of his employment was June 27, 2023; however, he remained on the DYS payroll until August 31, 2023. On July 31, 2023, Roberts apparently accepted another teaching position with a nonparty institution. Roberts also began, in September 2023, receiving retirement benefits through the Alabama Teachers' Retirement System.

Roberts attained tenure at the end of the 2021-2022 school year, before the nonrenewal of his employment. If his employment began on or after October 1, 2019, then he had not yet attained tenure. Roberts, relying on the date of the above-quoted email message from Dr. Smitherman, contended that he was hired on September 17, 2019 -- the date of the email message. Id. at 280. The DYS defendants maintained that Roberts's effective hire date was October 7, 2019, when he actually reported for training and his salary and benefits began accruing.

Ultimately, Roberts filed a verified "Complaint, Action for Declaratory Judgment and Petition for Writ of Mandamus" against the DYS defendants. His complaint asserted an estoppel claim and also included a count seeking a declaratory judgment and injunctive relief based on the DYS defendants' alleged violation of the Act. Roberts further requested the issuance of a writ of mandamus or related relief requiring the DYS defendants' compliance with the Act, including the following specific relief:

> "A. A finding and holding that [the DYS] Defendants have failed to comply with any and all mandatory statutory and/or other requirements of law as set forth in this Complaint.

5

"B. Compelling [the DYS] Defendants to comply with any and all mandatory statutory and/or other requirements of law as set forth in this Complaint.

"C. Rescinding [Roberts's] purported termination.

"D. Finding and holding that [Roberts] is entitled to such other further and different relief as the Court may award in its discretion."

Roberts's complaint also originally named, in addition to the DYS defendants, various State agencies as defendants ("the agency defendants"). All the named defendants in Roberts's complaint jointly filed a motion seeking a dismissal of Roberts's action on State-immunity grounds, which the trial court denied. In Ex parte DYS, however, this Court concluded that "the agency defendants [were] 'absolutely immune from suit'" under Article I, § 14, Ala. Const. 2022. 401 So. 3d at 284 (citation omitted). As to the DYS defendants, however, this Court determined that, under prior caselaw, Roberts's claims seeking a judgment declaring his rights under § 16-24C-4, Ala. Code 1975, and seeking injunctive relief in the form of reinstatement were not barred by principles of State immunity and, thus, that the trial court had correctly held that he was entitled to pursue those claims. Id. at 284-85.

6

In accordance with our decision in Ex parte DYS, the trial court subsequently vacated its order denying the joint dismissal motion filed by all the named defendants and granted that motion as to the agency defendants. Thereafter, proceedings on Roberts's claims against the DYS defendants resumed, culminating in a bench trial. After trial, the trial court "conclude[d] that Roberts was, in fact, tenured before [the DYS] defendants purported to 'non-renew' him as though he were untenured." Alternatively, the trial court found that because Roberts had relied on Dr. Smitherman's email as proof that he was hired and had thereafter resigned his prior tenured position in response, and because the subsequent delay in Roberts's training was attributable to DYS, "it would be a gross unfairness" to deny Roberts tenure and that DYS was, therefore, estopped from doing so. The DYS defendants appeal.

## Standard of Review

> "'"'"[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust."'" Water Works & Sanitary Sewer Bd. v. Parks, 977 So. 2d 440, 443 (Ala. 2007) (quoting Fadalla v. Fadalla, 929 So. 2d 429, 433 (Ala. 2005), quoting in turn Philpot v. State, 843 So. 2d 122, 125 (Ala.

7

2002)). "'The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.'" Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005) (quoting Dennis v. Dobbs, 474 So. 2d 77, 79 (Ala. 1985)). "Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts." Waltman v. Rowell, 913 So. 2d at 1086.'

"Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So. 2d 924, 929 (Ala. 2007). 'Questions of law are reviewed de novo.' Alabama Republican Party v. McGinley, 893 So. 2d 337, 342 (Ala. 2004)."

Moultrie v. Wall, 172 So. 3d 828, 839 (Ala. 2015). See also City of Birmingham Ret. & Relief Sys. v. McGough, 232 So. 3d 838, 841 (Ala. 2017).

## Discussion

On appeal, the DYS defendants first dispute that Roberts attained tenure as provided for in § 16-24C-4(1) before he was notified that his employment would not be renewed. The DYS defendants further dispute the trial court's determination that, even assuming that Roberts did not actually attain tenure under the Act, DYS was nonetheless estopped from denying Roberts tenured status under the facts.

I.

Section 16-24C-4(1), on which Roberts relies in asserting his claim that he was employed a sufficient amount of time to attain tenure, provides, in pertinent part:

> "A teacher shall attain tenure, and a classified employee shall attain nonprobationary status as follows:
>
> "(1) Except as otherwise provided by Section 16-23-3, [Ala. Code 1975,] a teacher who is not an employee of a two-year educational institution operated under the authority and control of the Department of Postsecondary Education, shall attain tenure upon the completion of three complete, consecutive school years of full-time employment as a teacher with the same employer unless the governing board approves and issues written notice of termination to the teacher on or before the last day of the teacher's third consecutive, complete school year of employment. For purposes of [the Act], a probationary teacher whose employment or reemployment is effective prior to October 1 of the school year and who completes the school year shall be deemed to have served a complete school year."

(Emphasis added.) Further, § 16-24C-4(3)a. specifies that "[o]nly complete school years of service as defined in [the Act] ... may be credited to the attainment of tenure or nonprobationary status." (Emphasis added.)

9

Roberts's claims were tried, in large part, on facts stipulated by the parties, including that Roberts considered himself "hired" when he agreed to accept employment with DYS on September 17, 2019, and that Roberts first reported to work on site for DYS on October 7, 2019, on which day his salary and all related benefits as a DYS teacher began to accrue. The trial court also received numerous items of documentary evidence, including, among others, the email communications between Roberts and Dr. Smitherman in September 2019, as discussed above; Roberts's resignation letter to his then-employer, also in September 2019; and the nonrenewal letter that Roberts received from DYS in March 2023, which terminated his employment effective August 31, 2023. In addition, the trial court also received limited testimony.

Roberts first testified at trial. He explained that since 1996, he had been employed with the Montgomery County public-school system and that he had resigned from his positions as both a schoolteacher and a school-bus driver "when [he] took the job [with DYS]." He explained that he submitted his resignation letter to the Montgomery County public-school system "in reliance on having received the position with DYS" and that his resignation was accepted "effective September 27th of 2019."

10

Roberts specifically testified that he had "already been hired by" DYS at the time he resigned. He further indicated that the job offer was extended to him through the email message he received from Dr. Smitherman, which "instructed [him] to carry out certain ... tasks for DYS," including providing verification of his years of experience and accumulated leave. According to Roberts, he did as instructed and, upon receiving Dr. Smitherman's email, "considered [himself] hired at DYS." He indicated, however, that his actual first day on the job was when he attended the required training session on October 7, 2019. Roberts also explained that he would have attended training when he accepted the job offer in September had he been asked to do so at that time.

Upon completing the training session, Roberts assumed his position as a teacher for the remainder of the 2019-2020 school year. Thereafter, he continued in that position as a teacher for the 2020-2021, the 2021-2022, and the 2022-2023 school years. It was during the 2022-2023 school year that, he testified, he received notification from DYS of his nonrenewal. Roberts explained that he was not provided a hearing, which he believed he was entitled to. He also indicated that he believed he was tenured after having worked for DYS for almost four years.

On cross-examination, Roberts conceded that an appointment letter he received from DYS appointed him effective October 7, 2019, which was also the date his insurance coverage became effective. According to Roberts, he had no knowledge of and was not informed that the last day of September "was an ending date under the tenure statute for that year to count." He did, however, concede that he was aware upon starting with DYS that "[he] had to start over with tenure," which, he was aware, required three years of employment. Although Roberts admittedly did not discuss the DYS tenure process with anyone during the application-hiring process or while employed by DYS, he stated that to his knowledge he was automatically tenured three years after being hired. Roberts deemed his hiring date to be the date he received the email from Dr. Smitherman rather than the subsequent date on which he began training. Accordingly, Roberts explained that, because he had already worked for DYS for more than three and one-half years, "[he] was under the impression that [he] was already tenured long before [receiving] the [nonrenewal] letter."

Roberts also presented testimony from Ethel Greene, a retired schoolteacher and school principal, who was serving as principal of the

Montgomery County public school from which Roberts resigned to accept employment with DYS. Greene confirmed that Roberts resigned during the 2019 school year because he had accepted a position with DYS. She also confirmed that, in connection with his resignation, Roberts worked out a two-week notice period and that September 27, 2019, was his final day of employment with the Montgomery County public-school system.

Ann Carol Sippial, the human-resources director for the Montgomery County public-school system, also testified. Regarding the process of hiring new teachers for the school system, Sippial explained that, "once they complete the paperwork, we process them in the system, and they're employed" even though "[i]t's not official until it goes through [the school] board minutes, [and] the board only meets once a month." She confirmed that, "after June, even though school hadn't started, [she] would consider them employed with the school system" despite the fact that the employee's first day of actual work might not be until August when the school year begins. She later clarified: "Even though they haven't started work yet, we have employed them." Also according to Sippial, the employee would have "signed all the paperwork prior to" entering the classroom but the "first day of work" would be the "beginning

13

time" for payroll and retirement purposes. If the employee later reneged on the employment agreement by accepting another job offer, the school system would notify the appropriate State oversight department for consideration of appropriate consequences because "[e]ven though they haven't started work yet, [the school system has] employed them."

In this case, Sippial indicated that she considered Roberts as having resigned from the Montgomery County public-school system effective September 27, 2019. The school system had already begun looking for Roberts's replacement upon receiving his resignation letter two weeks prior. Sippial agreed, on cross-examination, that tenure depends upon completed school years within the same school system and that the first year of employment does not count under the Act if the effective date of employment was on or after October 1.

DYS's only witness in response to Roberts's claims was Melody Nelson, who was, in 2019, employed as DYS's director of training. She indicated that she provided the training that DYS required every new employee to receive before beginning work in a DYS facility. According to Nelson, DYS offered new-employee training "every other month" rather than offering immediate training for a single new employee. As a

14

result, a prospective new teacher or employee could have to wait two months before completing the training session. Given that schedule, Nelson testified that, in 2019, for any prospective new employee "hired after the orientation began in August, then they would not be able to come [until] the October [training] date."[4] Thus, because the first available training session began on October 7, it would have been impossible for any prospective new DYS employee purportedly "hired" after the training session began in August to actually begin work before October 7.

As demonstrated by the foregoing testimony and by the parties' documentary evidence, both the DYS defendants and Roberts appear to agree that Roberts accepted, in September 2019, a job having a clear effective start date, i.e., a "contract" date, beginning <u>after</u> October 1, 2019. The parties' dispute turns on which of the foregoing was the date Roberts's "employment" was "effective" for tenure purposes under the plain language of § 16-24C-4(1): in order to have achieved three complete school years of employment as a teacher with DYS before his employment

_____

[4]We attach no legal significance to Nelson's use of the word "hired."

was nonrenewed in 2023, Roberts would have had to have been effectively employed under the Act before October 1, 2019.

The Act does not define the word "effective" as used in § 16-24C-4(1). See § 16-24C-3, Ala. Code 1975 (defining certain terms for purposes of the Act). In that absence, the DYS defendants contend that the ordinary dictionary definitions of the terms "employment" and "effective" apply and that, when combined, those definitions establish that "'employment' is 'effective' when the employer-employee relationship, in which the employer has control over the employee and pays him a wage, is operative." DYS defendants' brief at 33.

Roberts counters that his "employment" became "effective" under the Act once a binding agreement was reached between the parties:

> "[A] teacher's 'employment … is effective' … on the day the employment agreement is reached -- even if the teacher does not begin work until some time later. A thing is 'effective,' under the law, when it is <u>binding or enforceable</u> -- when it <u>has effect</u>. <u>See</u>, <u>e.g.</u>, <u>Black's Law Dictionary</u> (11th ed. 2019), 'Effective Date' ('The date on which a statute, contract, insurance policy, or other such instrument becomes enforceable or otherwise takes effect. This date sometimes differs from the date on which the instrument was enacted or signed.'), <u>quoted in</u> <u>GE Med. Sys. S.C.S. v. SYMX Healthcare Corp.</u>, [Case No. 18-CV-20922-BLOOM/Louis, Mar. 4, 2021] (S.D. Fla. 2021)."

Roberts's brief at 24.

16

"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says." IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So. 2d 344, 346 (Ala. 1992). See also Ex parte Mullen, 394 So. 3d 1072, 1076 (Ala. 2024). Further, "this Court regularly looks to dictionary definitions to ascertain the plain meaning of words used in a statute." State v. City of Birmingham, 299 So. 3d 220, 226 (Ala. 2019).

As defined in Black's Law Dictionary, "employment" is commonly understood to mean: "1. The relationship between master and servant. ... 2. The act of employing. 3. The quality, state, or condition of being employed; the condition of having a paying job. 4. Work for which one has been hired and is being paid by an employer." Black's Law Dictionary 663 (12th ed. 2024) (emphasis added). See also Merriam-Webster's Collegiate Dictionary 408 (11th ed. 2020) (defining "employment" as "activity in which one engages or is employed" (emphasis added)). The ordinary meaning of "effective" is as follows: "1 ... producing a decided, decisive, or desired effect ... 2: ready for service or action ... 3: actual ... 4: being in effect: operative ...." Merriam-

17

Webster's Collegiate Dictionary 397 (capitalization omitted).  See also Black's Law Dictionary 650 (defining "effective" as "[p]erforming within the range of normal and expected standards" and as "[p]roductive; achieving a result" (emphasis added)).

Here, in September 2019, Roberts and DYS reached an agreement for Roberts to undertake future employment as a teacher for DYS. Roberts was, at that time, specifically informed that his "contract" would not be effective until October 7, 2019.  He was not required to perform any employment-related responsibilities or to produce any results in his role as a teacher for DYS until reporting on October 7, 2019, to undergo mandatory training in preparation for assuming his employment responsibilities.  Not only did Roberts's pay as a teacher not begin until October 7, but his insurance, retirement, and other related employment benefits also did not start accruing until that time.  In fact, Roberts was not even qualified to engage in employment with DYS before October 7, 2019, because he had not, before that time, completed employment-related prerequisites.  See note 2 and accompanying text, supra. Furthermore, Roberts remained employed with the Montgomery County public-school system for a period after accepting Dr. Smitherman's offer

18

of employment -- his resignation was not effective until September 27. Therefore, Roberts did not begin full-time employment as a teacher with DYS until October 7, 2019.

As the DYS defendants note, it appears that, in concluding otherwise, the trial court, like Roberts, deemed the word "effective" as used in the Act to mean legally enforceable. In entering its judgment for Roberts below based on its reading of § 16-24C-4, the trial court held:

> "Roberts's employment was legally and factually 'effective' when, in September 2019, he and DYS agreed that he would take the position offered. An agreement is 'effective' when it has legal force and enforceability. With teachers in particular, an agreement to come to work for a school system has monumental legal force and enforceability as soon as the agreement is made, even if the agreement is made some days or weeks before the start of work. ... This was, in fact, the whole point of the 2018 amendment to Ala. Code § 16-24C-11 -- to ensure that an initially non-tenured teacher such as Roberts who has agreed to come to work for a school system is immediately bound by a legally effective employment agreement (effective and enforceable even through cancellation of the certificate of a teacher who tries to break that legally-effective employment relationship). It is quite common for school systems to hire new teachers over the summer well before the start of the next school year; the law makes such agreements to teach in the future enforceable as soon [as] the agreement exists. As soon as Roberts agreed to work for DYS, he was bound by an effective employment agreement. As this occurred prior to October 1, 2019, his work during that school year constituted his first year towards

19

tenure, and he was tenured before defendants attempted to non-renew him."

(Emphasis added.)

In so concluding, the trial court appears to have conflated the legal effectiveness of an <u>offer of employment</u>, i.e., reaching an agreement to be employed in the future that could give rise to legal repercussions if breached, with the effectiveness of employment for the purpose of determining a start date for calculating tenure under the Act. Contrary to that interpretation, we hold that, under the facts of this case, Roberts's employment was "effective," as that term is used in § 16-24C-4(1), when he was actually required to report and to perform and was being paid for that work. As the DYS defendants urge, this comports with the commonly accepted usage -- as opposed to any specialized legal significance -- of the words "effective" and "employment" as denoting performing services for which one is paid wages as a result. See <u>State v. City of Birmingham</u>, supra. It also appears to comport with the language of the Act itself, see <u>Alabama State Tenure Comm'n v. Green</u>, 409 So. 2d 850, 851 (Ala. Civ. App. 1981) ("[O]ne who serves as a 'teacher' for three consecutive school years and is reemployed (within the statutory definition of 'teacher') for the succeeding year by the same school system

20

attains continuing service status."). See § 16-24C-2, Ala. Code 1975. We thus hold that Roberts's "employment" was not "effective prior to October 1," 2019, for the purpose of determining tenure under § 16-24C-4(1). Accordingly, Roberts was also not effectively employed for tenure purposes for the 2019-2020 school year; thus, that year did not count as a "complete" school year. Because Roberts did not have three "complete, consecutive school years of full-time employment" with DYS before the nonrenewal of his employment, he did not attain tenure. Id.

Our holding is not impacted by the language of § 16-24C-11, Ala. Code 1975, on which the trial court explicitly relied in ruling in favor of Roberts regarding the effective date of his employment with DYS. That section, which is entitled "Termination of employment by teacher," provides, in pertinent part:

> "No public K-12 teacher shall be permitted to terminate his or her employment within 30 calendar days before the first day of the next school term for students, unless the termination is mutually agreed upon. ... Any public K-12 teacher terminating his or her employment in violation of this section is guilty of unprofessional conduct, and the State Superintendent of Education may revoke or suspend the certificate of the violating teacher."

§ 16-24C-11. As the DYS defendants note, that Code section does not appear to impose any corresponding limitation on the hiring school

21

system. Instead, it appears to carry out the stated "[l]egislative intent" of "improv[ing] the quality of public education in the State of Alabama" and ensuring that our public schools are able to "maintain[] a competent educational workforce" by preventing a teacher who has entered a legal agreement to undertake employment with that school system from withdrawing at the last minute and leaving the school system with a personnel void. § 16-24C-2.

## II.

We also reject the trial court's alternate conclusion that estoppel principles apply to afford Roberts tenure under the present facts. As noted, the trial court concluded that it would be manifestly unjust, in light of Roberts's testimony as to his reliance on the September 19 email from Dr. Smitherman and the fact that DYS provided the effective start date of Roberts's employment, to deny him tenure. Specifically, on this issue, it held:

> "[The DYS] defendants are estopped from denying that Roberts was tenured. To allow [the DYS] defendants to claim otherwise would be a manifest injustice in light of the facts. As a matter of fact, Roberts relied on the September 2019 communication from DYS that he was hired. He took action in reliance on that communication, leaving his prior tenured position with another school system, prior to October 1, 2019. The choice of what date he would start his paid work (in this

22

case, his initial training period which began on October 7) was not up to Roberts; it was, instead, a choice made by DYS through its agents. No one communicated to Roberts that, by virtue of that decision by DYS, DYS would take the position that his first nearly-full-year of work would not count towards tenure at all. No one communicated to Roberts that, even when he had put in substantially more months of teaching than is required for nearly all teachers to attain tenure in Alabama's schools, Roberts would still remain untenured. It would be a gross unfairness to allow defendants to take advantage of Roberts in this way. The Court finds that this is an appropriate application of estoppel, and that defendants should in equity be prohibited from denying that Roberts was tenured."

Again, we disagree.

As the DYS defendants maintain on appeal, there is nothing suggesting that they either misrepresented the circumstances under which Roberts could attain tenure or that Roberts, already a tenured teacher in another school system, was ignorant of the pertinent provisions of the Act and the October 1 cutoff date for tenure purposes when he accepted employment effective October 7. See Allen v. Bennett, 823 So. 2d 679, 685 (Ala. 2001) ("'"Under the settled law, equitable estoppel ... must be predicated upon the conduct, language, or the silence of the party against whom it is sought to be invoked."'" (citations omitted)). See also BSI Rentals, Inc. v. Wendt, 893 So. 2d 1184, 1187 (Ala. Civ. App. 2004) ("'The party asserting the doctrine of equitable

23

estoppel may not predicate his claim on his own dereliction of duty ....'" (citations omitted)). There are simply no facts in the record before us suggesting that Roberts relied on any <u>incorrect</u> information received from the DYS defendants to his detriment. See <u>Talladega City Bd. of Educ. v. Yancy</u>, 682 So. 2d 33, 36 (Ala. 1996) ("'"An estoppel ... has three important elements. The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies upon that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct."'" (citations omitted)). Compare <u>Boutwell v. State</u>, 988 So. 2d 1015, 1026 (Ala. 2007). Instead, to the contrary, DYS at all times represented to Roberts that his employment with DYS would become effective as of October 7, 2019, and nothing suggests that Roberts undertook or was required to undertake any employment duties as a teacher with DYS before that time.

Conclusion

Based on the foregoing, we hold that the trial court erred in concluding that Roberts was, either under the Act or applying principles of equitable estoppel, a tenured DYS employee before the nonrenewal of

24

his employment by DYS. The trial court's judgment concluding otherwise is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Stewart, C.J., and Wise, Bryan, Sellers, Mendheim, Cook, McCool, and Parker, JJ., concur.